# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

MARQUISE GRADY,

                                    Petitioner,

                    v.

M.D. BITER, Warden,

                                    Respondent.

Civil No.    13cv2479-BAS (MDD)


**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE
JUDGE RE DENIAL OF PETITION
FOR WRIT OF HABEAS CORPUS**

    This Report and Recommendation is submitted to United States District Judge Cynthia Bashant pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.
## FEDERAL PROCEEDINGS

    Marquise Grady (hereinafter "Petitioner"), is a state prisoner proceeding pro se and in forma pauperis with a Petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Petitioner was convicted by a San Diego County Superior Court jury of one count of first degree murder, three counts of premeditated attempted murder, one count of conspiracy to commit murder, and one count of shooting at an occupied motor vehicle.  (Lodgment No. 2, Clerk's Tr. ["CT"] at 531-38.)  The jury returned true findings on sentence enhancement

allegations that the offenses were committed for the benefit of a criminal street gang, and that Petitioner was a principal in offenses where at least one principal personally discharged a firearm. (Id.)  He was sentenced to 115 years-to-life in state prison.  (CT 546.)  Petitioner alleges here, as he did in state court, that his federal constitutional rights were violated due to: (1) insufficient evidence to support the convictions; (2) instructional error regarding conspiracy to commit attempted murder; (3) instructional error regarding the "kill zone" theory of attempted murder; (4) erroneous admission of expert testimony of a forensic video analyst; (5) erroneous admission of evidence that a key witness feared retaliation for testifying; (6) ineffective assistance of trial counsel in failing to call alibi witnesses, and of appellate counsel in failing to challenge the admission of rap lyrics; (7) improper denial of motions to relieve trial counsel and for self-representation; and (8) cruel and unusual punishment in sentencing, and ineffective assistance of trial and appellate counsel in sentencing and in failing to challenge the denial of the motions to relieve trial counsel and for self-representation.  (Pet. at 5-8, 21-59, 92-96.[1])  Petitioner requests an evidentiary hearing.  (Id. at 1.)

Respondent has filed an Answer ("Ans."), a Memorandum of Points and Authorities in support ("Ans. Mem."), and has lodged portions of the state court record.  (ECF Nos. 18-19.)  Respondent contends that an evidentiary hearing is unnecessary, and that habeas relief is not available because Claims 3-5 do not present a federal question, Claim 7 is procedurally defaulted, and the state court adjudication of all claims is neither contrary to, or involves an unreasonable application of, clearly established federal law.  (Ans. Mem. at 28-70.)

Petitioner has filed a Traverse.  (ECF No. 38.)  He requests the appointment of counsel, and presents additional claims which have not been presented to the state courts alleging cumulative error and ineffective assistance of trial counsel regarding the introduction of evidence that a key witness feared retaliation.  (Traverse at 3-23.)

For the following reasons, the Court finds that neither an evidentiary hearing nor the appointment of counsel is necessary or warranted, that Claim 7 and the Traverse claims are

---

[1] When citing to documents filed with the Court's Electronic Case Filing ("ECF") system, such as the Petition, Answer and Traverse, the Court will refer to the pages assigned by that system.

procedurally defaulted and without merit, that any errors with respect to Claims 2-5 are harmless, and that there is no claim for which the state court adjudication is contrary to, or involves an unreasonable application of, clearly established federal law, or is based on an unreasonable determination of the facts.  The Court **RECOMMENDS** the Petition be **DENIED**.

## II.

## STATE PROCEEDINGS

In an eleven-count Amended Information filed in the San Diego County Superior Court on February 18, 2010, Petitioner and three co-defendants, Martray Johnson, Martrell Johnson and Michael Allen, were charged with murder in violation of California Penal Code section 187(a) (count one); three counts of attempted murder in violation of Penal Code sections 187(a), 189 and 664 (counts two, three and four); conspiracy to commit murder in violation of Penal Code sections 187(a) and 182(a)(1) (count five); shooting at an inhabited vehicle in violation of Penal Code section 246 (count six); unlawful taking and driving of a vehicle in violation of California Vehicle Code section 10851(a) (count seven); carjacking in violation of Penal Code section 215(a) (count nine); and two counts of robbery in violation of Penal Code section 211 (counts ten and eleven).  (CT 240-53.)  Co-defendant Martray Johnson alone was charged with evading an officer with reckless driving in violation of Vehicle Code section 2800.2(a) (count eight).  (CT 251.)  The Amended Information included sentence enhancement allegations that: (1) the offenses were committed for the benefit of, at the direction of, and in association with, a criminal street gang, with the specific intent to promote, further and assist in criminal conduct by gang members, within the meaning of Penal Code section 186.22(b)(1); (2) Petitioner personally used a handgun during the commission of counts nine, ten and eleven; and (3) with the exception of count eight, all defendants were principals in offenses during which at least one principal personally used a firearm.  (Id.)

On March 5, 2010, the jury found Petitioner not guilty on counts seven, nine, ten and eleven, and guilty on all other counts; they returned true findings on the sentence enhancement allegations.  (CT 531-42.)  On May 21, 2010, the trial court denied a new trial motion, denied Petitioner's motion to relieve trial counsel, and sentenced him to 115 years-to-life.  (CT 546-47.)

Petitioner appealed, raising claims 1-5 presented in the Petition here. (Lodgment Nos. 3-5.) The appellate court affirmed in an unpublished opinion. (Lodgment No. 6, People v. Grady, No. D057450 (Cal.App.Ct. Feb. 14, 2012).) Petitioner thereafter filed a petition for review in the state supreme court raising the same claims. (Lodgment No. 7.) On May 9, 2012, the state supreme court denied relief with an order which stated: "The petition for review is denied." (Lodgment No. 8.) Petitioner presented the remaining claims raised in the Petition here in a habeas petition filed in the state superior court, which was denied with a written order. (Lodgment Nos. 9-10.) He thereafter presented the same claims in a habeas petition filed in the state supreme court. (Lodgment No. 11.) That petition was denied with an order which stated: "The petition for writ of habeas corpus is denied." (Lodgment No. 12.)

### III.

### EVIDENCE ADDUCED AT TRIAL

Petitioner's trial was consolidated with that of his co-defendant Martrell Johnson, the two alleged shooters, and their trial was severed from the trial of co-defendants Martray Johnson, the getaway driver, and Michael Allen, the third man in a trio of men accused of shooting at an occupied vehicle with two firearms. (CT 477.) Proceedings against Martrell were suspended and Petitioner proceeded to trial alone. (Lodgment No. 1, Reporter's Tr. ["RT"] at 552.) Two days before the scheduled start of trial, Petitioner brought a Marsden/Faretta motion.[2] As discussed in detail below in Claim 7, Petitioner informed the trial judge that: (1) his appointed trial counsel had not shown him discovery and they had not adequately discussed trial strategy; (2) he did not get along with trial counsel and they argued, although Petitioner could not articulate what they argued about, and counsel said they got along well; (3) if he could not have substitute counsel then he felt like he would like to run his defense himself, in part because he

---

[2] People v. Marsden, 2 Cal.3d 118, 123 (1970) (holding that a criminal defendant represented by appointed counsel or the public defender may request that the court discharge the attorney and substitute new counsel if the defendant's right to counsel would be substantially impaired by continuing with the original attorney); Faretta v. California, 422 U.S. 806, 819-36 (1975) (holding that the structure of the Sixth Amendment implies a right to self-representation, and a state violates that right when it forces a criminal defendant to accept a state-appointed attorney after he knowingly and intelligently waives his Sixth Amendment right to counsel and clearly and unequivocally declares a desire to represent himself).

did not think that any counsel hired to represent him could be sufficiently worried about him, in that his life was on the line and the system was not fair; and (4) he was only willing to represent himself if the trial, scheduled to begin in two days, could be postponed. (Lodgment No. 13.)  The motion was denied on the basis that Petitioner had not identified a conflict with defense counsel and had not unequivocally indicated an intent to represent himself, and because defense counsel had so far provided exemplary representation. (Id.)

Arik Ibarra testified that he was 18 years old on Monday, October 20, 2008, and was with his friends Demetrius Washington, Nicholas Westbrook, Joel Carmichael and Westley Dozier. (RT 660-61.)  They were in a black Ford Probe driven by Washington; Dozier was in the front passenger seat, and Ibarra, Westbrook and Carmichael were in the back.  (RT 662-63.)  They drove from Ibarra's house to the Island View liquor store on Logan Avenue; Washington parked the car in front of the store and Dozier went inside.  (RT 664.)  Ibarra noticed they had parked next to a red car driven by a man he recognized from school, one of the two Johnson brothers, Martray and Martrell, who he thought were twins; he identified the driver of the red car as Martray by a facial disfigurement caused when he was shot in the face.  (RT 665-66, 671-72.)  Ibarra also recognized from school the only other person in the red car, a woman in the front passenger seat named Mercedes Davis.  (RT 666-67, 673.)  Ibarra knew that Martray and Martell were members of the Neighborhood Crips street gang.  (RT 668, 672.)  Ibarra was born and raised in Lincoln Park, and although he was not a gang member, he had many friends who were members of the Lincoln Park Logan Bloods street gang, including Joel Carmichael, and testified that the Neighborhood Crips are rivals of the Lincoln Park Logan Bloods.  (RT 668-70, 679.)  Ibarra said he was surprised to see Martray, and was concerned something was about to go down, because they were in the heart of Lincoln Park Logan Blood gang territory, and he did not "think any Crip would be dumb enough to be in there."  (RT 673.)

Ibarra exited the car and told his friends he was going in the store and to keep an eye on the red car.  (RT 674-77.)  Before he could go inside, the red car backed out of the parking lot and stopped at the curb in front of a low brick wall separating the liquor store parking lot from the parking lot of the office building next door.  (RT 678-79.)  Ibarra saw three or four men

come from the area next to the brick wall where the red car was parked, he saw gunshots fired at the black Probe from about 40 feet away by those men, and he dove to the ground behind the Probe.  (RT 681-83, 686-87, 689-90.)  Ibarra suffered a gunshot wound to his left thigh, and identified Martray's brother Martrell as one of the shooters.  (RT 683-84, 692, 756.)  Ibarra gave the police a statement later that night at the hospital, adding that when got out of the car, he yelled at Dozier in the store to hurry up, and yelled at Mercedes Davis in an attempt to get her attention, but she ignored him.  (RT 716-18.)  Ibarra told the police that he saw Martray throw a gang sign with his hand as he backed the red car out of the parking lot, just before three Black males, one carrying a black revolver, came from behind a trash dumpster.  (RT 719.)  Ibarra said he heard gunshots, dove to the ground, and saw the men run to and get in the red car.  (RT 719-20.)  He said that as the red car took off, a police car came around the corner and chased it, and said that because Dozier and Westbrook had run away, Washington drove Ibarra and Carmichael to the hospital.  (RT 721.)  A videotape of Ibarra's police interview was played for the jury, and a transcript is in the record.  (RT 737; CT 255-86.)

Henry Ingram, a City of San Diego Police Officer, testified that he arrived at the hospital about 10:00 p.m. on the night of the shooting, where he observed a black Ford Probe in the parking lot with gunshot damage to a window and a flat tire from which a bullet was later recovered.  (RT 710-11, 1235.)  Joel Carmichael was in surgery for a gunshot wound to the left side of his head, of which he later died.  (RT 712-13.)  Ibarra had a through-and-through gunshot wound to his leg.  (RT 713-15.)  Ibarra identified Martray Johnson and Mercedes Davis from photographs that night as the driver and passenger of the red car.  (RT 726-27.)

Nicholas Westbrook testified that he was 17 years old on October 20, 2008, and was with his cousin Demetrius Washington and their friends Arik Ibarra, Westley Dozier and Joel Carmichael at the Island View liquor store that evening.  (RT 760-61.)  When they arrived at the store, Dozier got out of the car and went inside; Westbrook remained in the middle of the back seat with Ibarra to his right, Carmichael to his left, and Washington in the driver's seat.  (RT 762.)  Westbrook testified that Ibarra said, "they probably might start shooting," just before five or six gunshots were fired from their left, shattering the left rear window of their car; Westbrook

grabbed Carmichael and they ducked down, but Carmichael had been shot in the head.  (RT 763, 766.)  Dozier came out of the store and "started freaking out," and Westbrook exited the car and ran to Washington's father's house.  (RT 763, 768.)

Demetrius Washington testified that he was 18 years old on the night of the shooting and was driving a black Ford Probe that night.  (RT 771-73.)  Washington said he ducked down on the seat when he heard gunshots, but was unable to remember much of what had happened, other than driving them to the hospital, because he had been scared.  (RT 777-80.)

Westley Dozier testified that he was 19 years old on the night of the shooting, and was inside the liquor store when he heard about four gunshots; when he came outside he was told that Carmichael, his uncle, had been shot in the head.  (RT 784-93, 796.)  Dozier said that a police car came around the corner just as he told the cashier to call the police.  (RT 793-94.)  When he saw that Carmichael was unconscious he told Washington not to wait for an ambulance but to drive them to the hospital.  (RT 794-95.)

Duane Malinowski, a San Diego Police Detective assigned to the street gang unit which monitors the Lincoln Park criminal street gang, testified that he searched Mercedes Davis' bedroom and found items indicating that she admitted to committing crimes for the benefit of the Crips gang.  (RT 798-810.)  Malinowski also testified that he knew Joel Carmichael to be a member of the Lincoln Park Bloods gang.  (RT 811.)

Kenneth Fortier, a San Diego Police Officer, testified that he was on patrol on October 20, 2008, when, about 9:53 p.m., he observed a red, four-door Geo Prizm parked in a red zone in front of the Island View Liquor store on Logan Avenue with someone running into the back seat of the car.  (RT 824-25, 1084.)  Fortier pulled in behind the car, shined a spotlight through the back window, and saw four or five young Black males in the car.  (RT 825-26.)  The Geo accelerated, reaching about 60 miles per hour quickly, and Fortier followed it with his overhead lights and siren activated because it was exceeding the speed limit; he had not heard gunshots, but thought the liquor store may have been robbed.  (RT 827-29.)  The Geo ran a stop sign and a stop light as it continued at a high rate of speed, entered the 805 freeway, left the freeway at the next exit, and ran the red light at the top of the exit ramp.  (RT 830-31.)  It spun out and

stopped when it hit a curb at the top of the exit ramp, pointing the wrong direction in the westbound lanes of Market Street, with Fortier just a few car lengths behind. (RT 831.) Fortier observed three Black males, at least one wearing a hat, get out of the Geo and run away; the driver stayed in the car and sped off. (RT 832-33.) A police helicopter arrived overhead and both the helicopter and Fortier followed the Geo. (RT 833.) The Geo proceeded in the wrong direction on Market Street, entered 45th Street in the wrong direction, and then turned on F Street where the driver leapt out and ran, leaving the car to roll into the side of a house. (RT 834-35.) The helicopter pilot indicated that the suspect had entered a house, the address of which matched the address on the registration of the red Geo; Martray and Martrell Johnson both lived at that address, and the police arrested Martray when he exited the house five or ten minutes after Fortier had lost sight of the driver of the Geo. (RT 843-44, 1093-95.)

Mercedes Davis testified that Martray Johnson was her boyfriend in 2008, that Martray and his brother Martrell were both associated with the Neighborhood Crips, and she had family members who were Crips. (RT 862-67.) She said that on the evening of October 20, 2008, Martray picked her up at her house in his grandmother's red Geo Prizm for a date, and they planned on going to his grandmother's house to watch movies. (RT 870-71.) While they were on their way there, Martray received a phone call on a cell phone; he then told her they were going to pick up someone. (RT 873-74.) They stopped at a liquor store on Logan Avenue so Mercedes could buy a soda. (RT 878.)

Mercedes said she was about to get out and go in the store when a car pulled up next to them. (RT 879.) She recognized Ibarra, Dozier and Washington in that car from school. (RT 879-81.) The men in the car attempted to get her attention in a manner she believed meant they wanted to start a fight with Martray, and she asked Martray to leave because he was a Neighborhood Crip and she thought the men were Lincoln Park Bloods. (RT 881-83.) Martray hesitated a moment but then backed his car out of the parking lot; as they were backing out she heard gunshots, ducked and saw Ibarra and Washington duck. (RT 887-91.) Three men then entered the back of Martray's car and they drove down Logan Avenue with a police car chasing them. (RT 894-95.) Martray ran stop signs and red lights until the car stopped and the three

men jumped out and ran; one of the men had a shiny silver handgun in his hand and a hat on his head. (RT 896-900.) Martray drove a bit further and leapt and ran from the car while it was still moving; Mercedes stayed in the car until it came to a stop and walked to the nearby house of a friend. (RT 908.) She was unable at trial to identify any of the men in the back seat, and said she could not remember if she had identified Michael Allen and Martrell Johnson as two of those men in her police interview or in court at the preliminary hearing. (RT 902-18.) The appellate court noted that, "her testimony was marked by hesitancy, equivocation, inconsistency, and incredible memory loss." (Lodgment No. 6, People v. Grady, No. D057450, slip op. at 26.)

Mercedes said at trial that she did not want to testify because "things happen" to people who testify against gang members, and although she was worried or concerned about testifying, she said her concerns would not affect her testimony. (RT 910-12.) She initially said she was not scared to testify, but almost immediately admitted she was "a little bit" scared. (RT 911-12.) She testified, over a defense objection, that she had moved out of state at the suggestion of her mother when the tires on her mother's car were slashed and a fire set on the windshield just after Mercedes had given her police statement, which was before any of the defendants, other than Martray, were in custody. (RT 913-14.) She said she was not testifying voluntarily, but only because she had been told she would be brought back to San Diego in custody if she ignored her subpoena. (Id.)

A recorded interview with Mercedes which took place at the San Diego Police station at 3:30 a.m. on October 21, 2008, was played for the jury. (RT 931-33.) A transcript is in the record. (CT 287-324.) In addition to her trial testimony, Mercedes said in the police interview that Martray drove them to the liquor store in order to pick up some of Martray's "homeboys" after Martray received a cell phone call. (CT 291.) She said she spoke to Ibarra, Dozier and Washington in the parking lot, but knew they did not like Martray, so she asked Martray to leave in order to avoid trouble, and said: "I don't know where his homeboys came out of but they just came and they started shooting." (CT 292, 296.) She said three Black male teenagers then jumped into the back of their car, one lighter-skinned than the others, and they sped off followed by a police car; the three men ran when the car spun out; one was sitting directly behind her

wearing a "kind of grey jacket and a hat," and carrying a silver gun, but she did not know his name; the other two were Martray's brother Martrell, who was wearing a black hooded jacket and sitting in the middle, and the other, the lighter-skinned male, was named Mike, who was wearing a t-shirt and sitting behind the driver.  (CT 308-12, 316, 321-23.)

A San Diego Police Detective seized video from a surveillance system at the liquor store, a newly-installed system with 16 cameras, and described it for the jury.  (RT 962, 966, 1063-64.) He said it showed a red Honda, later determined to have been stolen, pull in and park in front of the store, and three Black males exit the car and walk out of sight around a pillar.  (RT 1064.) A red Geo driven by a male with a female passenger then pulls into the parking lot just before a black Ford Probe pulls in and parks.  (RT 1065.)  As the red Geo begins to back out of the parking lot, the driver of the Probe appears to engage in conversation with the occupants of the Geo, and the driver of the Geo appears to make a hand gesture as he pulls the car slowly onto Logan Avenue near the pillar where three occupants of the stolen Honda had walked out of the frame.  (Id.)  Gunshots appear to be fired from near the pillar towards the Probe just before the same three men who had arrived in the stolen Honda get into the back of the Geo, which speeds off followed by a marked police car.  (RT 1065-66.)  The video was played for the jury and was introduced into evidence along with photographic stills captured from the video.  (RT 1069-73.) Respondent has lodged a compact disk containing surveillance video of the shooting from four simultaneous camera angles.  (Lodgment No. 15.)

Adrian Diaz testified that on October 20, 2008, just after 10:00 p.m., he was entering his apartment when a young Black male, who he identified as Petitioner's co-defendant Michael Allen, asked if he could come inside and use the telephone.  (RT 935-36.)  Diaz told him to wait outside, but Allen came inside and sat on a sofa.  (RT 937.)  Diaz was concerned because his wife and daughter were in the apartment, but he allowed Allen to use the phone and heard Allen ask someone to come pick him up.  (RT 938.)  That number was later determined to be registered to Allen's residence.  (RT 959.)  Allen then asked Diaz to give him a ride, and Diaz agreed, thinking it was the only way to get him out of the apartment; Allen vomited just outside the door. (RT 938-39.)  Diaz saw a police helicopter in the area and heard sirens, so he asked Allen if the

police were looking for him, and Allen said the police were chasing him. (RT 940-41.)  Diaz drove Allen about four blocks away and dropped him off. (RT 941.)  Police officers were in the area when he returned to his apartment and he reported what had happened. (RT 944-45.)

Gabriel Bidales testified that he was in his car, a BMW, about 1:41 a.m. the day before the shooting, talking to his girlfriend Stephanie Grandos, who was leaning in the passenger window, when two Black males wearing white baseball batting gloves, one carrying a silver revolver, approached them. (RT 1523-28.)  Bidales identified the man with the gun as Martrell Johnson; he said he only got a glimpse of the other, unarmed man, and initially tentatively identified him from a photographic lineup about a month later as Petitioner, but the identification weakened over time, so he was unable to identify Petitioner at the preliminary hearing or at trial. (RT 1535-44, 1558-59, 1717.)  Bidales testified that he was forced out of his car, Grandos was knocked to the ground, and the men took his wallet, cellphone and their necklaces before driving off with his car. (RT 1525-29.)  In the back of his car was a baseball hat with a San Diego logo. (RT 1533.)  Grandos was unable to identify either man. (RT 1570.)

The police searched a trash-strewn path which led into Diaz's apartment complex from where the red Geo Prizm spun out, and found a baseball cap with a San Diego logo which Grandos identified as having been in her car when it was stolen, a "do-rag," a white short-sleeved t-shirt, a dark long-sleeved t-shirt, and a pair of white baseball batting gloves, all of which looked out of place from the other discarded items along the path, as if they had not been there long. (RT 969-80, 1211-18, 1533.)  A loaded silver revolver containing two live cartridges which had misfired and four spent cartridges was found in a patch of ice plant directly between where the baseball cap and the "do-rag" were found, "within throwing distance of the path." (RT 982-85, 1090, 1314-18.)  The white t-shirt was found in Adrian Diaz's apartment complex at the end of the path, near where Diaz approached the officers and reported his encounter with Allen. (RT 956.)

Forensic evidence indicated that at least five shots were fired at the black Probe, at least one from the silver revolver found in the ice plant, and four from a second, unrecovered firearm. (RT 1108, 1324-25.)  The bullet recovered from Carmichael's brain was fired from the silver

revolver, but no fingerprints or usable DNA were found on the gun. (RT 1107-08, 1240, 1322-24, 1376.) DNA from only two people, Petitioner and Bidales, was found on Bidales' baseball cap; Petitioner's DNA was found on the "do-rag," and on a plastic comb found in the red Geo Prizm. (RT 1360-64, 1378.) Allen's DNA was found in the vomit on Diaz's porch; DNA from Allen and Davis were found on the interior collar of the white t-shirt, and Allen's DNA was found on the dark t-shirt. (RT 1349-50, 1367-68.) DNA from Allen, Martrell and Davis was found on the right-handed baseball batting glove, and from Martrell, Martray and Davis on the left-handed glove; Petitioner could not be excluded as a possible contributor of DNA found on either glove. (RT 1353-58, 1431-32.) Petitioner could not be excluded as a contributor of DNA found on the rear interior passenger door handle, armrest, and window crank of the Geo. (RT 1371-72.) Martrell's fingerprints were found on the Geo's rear exterior door handle, rear exterior window, and rear roof. (RT 1443-44.)

Grant Fredericks, a forensic video analyst, synchronized recordings from the surveillance cameras at the Island View liquor store, and played them for the jury while he described what they showed. (RT 1487, 1495-96.) Three males, all wearing white gloves, are seen parking and exiting a Honda in the liquor store parking lot and walking out of the camera's view; the driver is dark-complected, wearing a dark, long-sleeved hooded jacket with a long white shirt hanging out underneath; the front passenger is dark-skinned, wearing a checkered jacket and a baseball hat with a logo, and protruding from the rear of his hat is something fist-sized which Fredericks agreed with the prosecutor could be consistent with a knot of a "do-rag"; the rear passenger is dark-skinned, but with lighter skin than the others, wearing a dark waist-length jacket with a white garment protruding from and hanging below the jacket. (RT 1497-1500.)

Five minutes and 28 seconds after the Honda arrives, a black car pulls into the parking lot a few stalls away from the Honda; the black car is followed closely by a red Geo which pulls into the parking lot; Fredericks could not determine whether there was any interaction between the occupants of the Probe and the Geo. (RT 1502-05.) The Geo backs out of the parking lot and parks on Logan Avenue 31 seconds after arriving. (RT 1509.) The front passenger of the black car is seen walking around inside the store. (RT 1510.) About 30 seconds after the red

car pulled out, the driver of the black car, who had exited and was standing next to the driver's door, ducks down and crawls back into the black car as a white-gloved hand is seen firing a gun; the rear passenger window of the black car shatters, debris comes off a wall where bullets strike it, and three men who match the appearance of the three men who came from the Honda are seen getting into the back of the Geo, which speeds off chased by a police car.  (RT 1505-16.)

Fredericks opined that the first of the three men to come back into camera view is the driver of the Honda, who appears to be shooting, and is the second man to get into the back of the red car parked at the curb on Logan Avenue; he is followed closely by the lighter-skinned person who emerged from the rear passenger seat of the Honda, who in Fredericks' opinion does not appear to be shooting, and is the first to enter the red car, seated behind the driver; the third man, the front passenger of the Honda, is wearing a baseball cap with a logo with a knot in the back and is in Fredericks' opinion the probable other shooter; he is seen following the others and is last to get into the red car, seated behind the passenger.  (RT 1574-84.)  The red Honda was stolen sometime after 9:00 p.m. the evening of the shooting.  (RT 1478-80.)  Allen's fingerprints were found inside the Honda, but no usable DNA was collected.  (RT 1374, 1444.)

An FBI agent testified that cell phone records indicated that Allen and Martray called one another at least nine times within 20 minutes of the shooting, with the last three calls occurring within 90 seconds of the shooting.  (RT 1762-91.)  Jack Schaeffer, a City of San Diego police officer and a gang expert, testified that the Neighborhood Crips is a criminal street gang whose members routinely shoot and murder other gang members, including the Lincoln Park Bloods, and routinely commit crimes such as murder, assault with deadly weapons, drive-by shootings, attempted murder, drug dealing, robberies, and carjackings.  (RT 1796-1812.)  Schaeffer testified that Petitioner and his co-defendants associate with each other and are all documented, admitted, and active members of the Neighborhood Crips.  (RT 1812-21, 1826-35.)  He opined that the shooting benefitted the Neighborhood Crips, and was consistent with a planned, coordinated, gang-retaliation murder.  (RT 1835-43.)  A notebook containing violent rap lyrics which mention shootings and the Crips was seized during a search of Petitioner's bedroom one month after the shooting.  (RT 1057-58.)  It was introduced into evidence over a defense objection, and defense

counsel introduced copies of rap lyrics from the mainstream "gangster rap" music genre, which counsel pointed out were mentioned in the notebook, and argued were similar to Petitioner's lyrics.  (RT 1821-25.)  The People rested.  (RT 1886.)

The defense called Petitioner's mother, who testified that at the time of the shooting Petitioner was living with her and her sister and nieces.  (RT 1891-92.)  She testified that Petitioner did not own a car but got around by walking and using public transportation, that he and his friends wore one another's clothes, and that Petitioner did not own a baseball cap, although she had seen him wear one occasionally.  (RT 1894-96.)  A defense investigator testified that Petitioner's house is a 13 minute walk from the path where the police found the items which contained his DNA.  (RT 1901-02.)  The defense rested and there was no rebuttal. (RT 1904.)

The jury was instructed and the attorneys presented closing argument.  (RT 1932-2080.) Defense counsel argued that the only evidence against Petitioner was circumstantial, and in order to convict him the jury would have to assume Petitioner had been in the Honda, assume he was one of the three men in the group who had fired the shots and jumped in the Geo, and assume the hat and "do-rag" containing his DNA were discarded while the men were running from the police, rather than earlier.  (RT 2021-23.)  Counsel reminded the jury of their instruction that if they can draw two reasonable conclusions from the circumstantial evidence, one of guilt and one of innocence, they must choose innocence, and argued that it was reasonable to find Petitioner was not among the shooters because: (1) Ibarra could, with a high degree of detail in the well-lit parking lot, identify Martray and Mercedes in the red Geo, and identify Martrell as a shooter, but could not identify Petitioner; (2) Mercedes Davis, in violation of her gang code, identified Allen and Martrell as two of the three men who got into the back of the red Geo, but did not identify Petitioner, which would have amounted to the same violation, despite the fact that she presumably knew him because the gang expert testified they associated with each other; (3) all of the evidence presented at trial involved Martrell, Allen and Martray, but not Petitioner; and (4) the prosecution's only theory of guilt was that Petitioner was a Neighborhood Crip who hung out with Martrell and Martray, which in fact explained why his DNA was found in the red Geo

and on the hat and "do-rag," as they were friends who shared clothing, and Petitioner lived near and used the path where those items were found. (RT 2023-53.) Counsel thoroughly challenged the identification by Bidales of Petitioner as one of the two men who carjacked Bidales and robbed him and Grandos. (RT 2053-57.)

On March 5, 2010, after deliberating approximately one and one-half days, the jury found Petitioner not guilty of stealing the red Honda, not guilty of carjacking Bidales, and not guilty of robbing Bidales and Grandos; they found him guilty of first degree murder of Carmichael, guilty of attempted premeditated murder of Ibarra, Westbrook and Washington, guilty of conspiracy to commit murder, and guilty of shooting at an inhabited vehicle. (CT 523-42; RT 2259-67.) With respect to the guilty counts, the jury returned true findings that Petitioner was a principal in crimes where at least one principal had personally used a firearm, and that the crimes were committed for the benefit of a criminal street gang. (Id.)

Just prior to sentencing, Petitioner brought a second Marsden motion in which he complained that defense counsel had not provided him with complete discovery until after trial, that Petitioner had never received a copy of the preliminary hearing transcript, that counsel did not subpoena alibi witnesses, and that there was a conflict of interest because Petitioner had written a complaint letter about counsel to the state bar association. (RT 2271-73.) Defense counsel said he had interviewed the alibi witnesses but they were only able to account for Petitioner's whereabouts before and after the shooting, and not for a two or three hour period around the time of the shooting. (RT 2274.) The judge denied the motion, finding that simply writing a complaint letter to the state bar did not create a conflict of interest, that Petitioner had failed to persuasively show how counsel could have done anything better, and that Petitioner had been competently represented, particularly since counsel had made a superlative closing argument which convinced the jury to acquit him of several charges. (RT 2275-78.)

The defense brought a motion for a new trial on the basis that one of the jurors had fallen asleep during the testimony of the prosecution's expert on cell phone usage. (RT 2281-82.) The motion was denied because everyone in the courtroom had noticed the juror nod off that one time, and the juror was quickly woken and had not missed the presentation of any evidence. (RT

2282-84.)  Petitioner was sentenced to 115 years-to-life, consisting of a term of 25 years-to-life on count 1, consecutive terms of 25 years-to-life on count 2 and on the gang enhancement finding, and consecutive terms of 20 years-to-life on counts 3 and 4; the sentences on the remaining counts and enhancements were stayed.  (RT 2295.)

## IV.

## **PETITIONER'S CLAIMS**

(1)  Petitioner was denied his Fourteenth Amendment right to due process because there is insufficient evidence to support the convictions, as the evidence did not demonstrate that he was present at the crime scene, but merely showed he associated with the perpetrators.  (Pet. at 5, 21, 26-34.)

(2)  Petitioner was denied his Fourteenth Amendment rights to due process and a fair trial with respect to his convictions for attempted murder because it is unclear whether the jury chose to convict him of conspiracy to commit attempted murder, which is an invalid theory, as the mental state required for conspiracy is incompatible with the mental state required for attempted murder.  (Pet. at 5, 21, 35-39.)

(3)  Petitioner was denied his rights to due process and a fair trial as protected by the Sixth and Fourteenth Amendments when the trial court instructed the jury on the "kill zone" theory of attempted murder, which allowed conviction without evidence that he had the specific intent to attempt to kill each victim.  (Pet. at 5, 21, 40-45.)

(4)  Petitioner was denied his Fourteenth Amendment rights to due process and a fair trial by the admission of the testimony of the forensic video analyst because it invaded the province of the jury to determine whether he was one of the persons seen in the poor-quality videos.  (Pet. at 5-6, 22, 46-51.)

(5)  Petitioner was denied his rights to due process, a fair trial, and the effective assistance of counsel, as protected by the Sixth and Fourteenth Amendments, by the introduction of Mercedes Davis's testimony regarding her fear of retaliation, because it was: (1) irrelevant, as there was no evidence she had been threatened by Petitioner or that her fear had influenced her testimony; (2) introduced without sufficient objection by defense counsel; and (3) not harmless

1   error, but even if it was, when considered with the other trial errors found to be harmless,

2   resulted in cumulative error.[3]  (Pet. at 6, 22, 52-59; Traverse at 12.)

3       (6)   Petitioner was denied his Sixth Amendment right to the effective assistance of

4   counsel by trial counsel's failure to call alibi witnesses, and by appellate counsel's failure to

5   raise an issue challenging the introduction of rap lyrics.  (Pet. at 6, 94.)

6       (7)   Petitioner was denied his Sixth Amendment rights to represent himself and to the

7   effective assistance of counsel by the denial of his <u>Marsden</u> and <u>Faretta</u> motions.  (Pet. at 7, 95.)

8       (8)   Petitioner was denied his Eighth Amendment right to be free from cruel and unusual

9   punishment by imposition of a sentence of 115 years-to-life, and denied his Sixth Amendment

10  right to the effective assistance of counsel by the failure of trial and appellate counsel to

11  challenge the sentence and to challenge the denial of his <u>Marsden</u> and <u>Faretta</u> motions.  (Pet. at

12  7, 95-96.)

13                                      **V.**

14                                 **<u>DISCUSSION</u>**

15      For the following reasons, the Court finds that neither an evidentiary hearing nor the

16  appointment of counsel are necessary or warranted with respect to any claim.  The Court finds

17  that Claim 7 and the Traverse claims are procedurally defaulted and without merit.  The Court

18  also finds that any errors regarding Claims 2-5 are harmless, and that the adjudication by the

19  state court of the claims which were adjudicated on the merits in the state court is neither

20  contrary to, nor involves an unreasonable application of, clearly established federal law, and is

21  not based on an unreasonable determination of the facts.   Accordingly, the Court

22  **RECOMMENDS** the Petition be **DENIED**.

23  **A.     Standard of Review**

24      Title 28, United States Code, § 2254(a), as amended by the Anti-terrorism and Effective

25  Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, provides, with

26  respect to claims which were adjudicated on their merits in the state court, that in order to obtain

27  _____

28      [3] The cumulative error and ineffective assistance of counsel aspects of Claim 5 are not presented in the Petition, but are raised for the first time in the Traverse.

federal habeas relief, a petitioner must first demonstrate that the state court adjudication of the claims: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C.A. § 2254(d) (West 2006).  Even if the petitioner can satisfy § 2254(d), or show that it does not apply, he still must show a federal constitutional violation occurred.  Fry v. Pliler, 551 U.S. 112, 119-22 (2007); Frantz v. Hazey, 533 F.3d 724, 735-36 (9th Cir. 2008) (en banc).  Petitioner must also demonstrate that any constitutional error is not harmless, unless it is of the type included on the Supreme Court's "short, purposely limited roster of structural errors."  Gautt v. Lewis, 489 F.3d 993, 1015 (9th Cir. 2007), citing Arizona v. Fulminante, 499 U.S. 279, 306 (1991) (recognizing that "most constitutional errors can be harmless.").

A state court's decision may be "contrary to" clearly established Supreme Court precedent (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent."  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  A state court decision may involve an "unreasonable application" of clearly established federal law, "if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."  Id. at 407.  Relief under the "unreasonable application" clause of § 2254(d) is available "if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."  White v. Woodall, 572 U.S. ___, 134 S.Ct. 1697, 1706-07 (2014), quoting Harrington v. Richter, 562 U.S. 86, __, 131 S.Ct. 770, 787 (2011).

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable."  Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

-18-

Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions . . ."  Williams, 529 U.S. at 412.  In order to satisfy § 2254(d)(2), a federal habeas petitioner must demonstrate that the factual findings upon which the state court's adjudication of his claims rest, assuming it rests upon a determination of the facts, are objectively unreasonable.  Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

"As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786-87.  The Supreme Court has stated that "[i]f this standard is difficult to meet, that is because it was meant to be . . . [as it] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court decision conflicts with this Court's precedents." Id. at 786 ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.") (internal quotation marks omitted).

**B.     Claim 1**

Petitioner contends in Claim 1 that there was insufficient evidence presented at trial to support his convictions because the evidence merely showed he associated with the perpetrators, but there was no evidence he was present at the shooting.  (Pet. at 5, 21, 26-34.)  He argues there were no eyewitness identifications of him, he was not identifiable on the videos, there were no cell phone records linking him to the incident, and the DNA evidence did not establish when he had been in the Geo, when the items containing his DNA were dropped along the escape path, or whether he had dropped them.  (Id.)

Respondent answers that Petitioner has failed to demonstrate that the state appellate court's denial of this claim, on the basis there was sufficient evidence for the jury to reasonably infer that Petitioner was one of the shooters, involved an objectively unreasonable application of clearly established federal law.  (Ans. Mem. at 28-34.)  Petitioner replies that there are innocent explanations for the presence of his DNA, and that evidence of his identity was

1  inconclusive in light of the questioning by police of a third suspect and by the testimony of

2  Davis that she did not know the third man even though the gang expert testified that Petitioner

3  associated with the other individuals involved. (Traverse at 4-5.) He argues that an evidentiary

4  hearing and the appointment of counsel are warranted with respect to this claim. (Id.)

5       Petitioner presented Claims 1-5 to the California Supreme Court in a petition for review,

6  and to the state appellate court on direct appeal. (Lodgment Nos. 3, 7.) The state appellate court

7  denied the claims on the merits in a reasoned opinion, and the state supreme court summarily

8  denied the petition for review without a statement of reasoning. (Lodgment Nos. 6, 8.) The

9  Court applies the following rebuttable presumption: "Where there has been one reasoned state

10  judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting

11  the same claim rest upon the same ground." Ylst v. Nunnemaker, 501 U.S. 797, 803-06 (1991).

12  With respect to Claims 1-5, therefore, the Court will look through the silent denial by the state

13  supreme court to the appellate court opinion, which, with respect to Claim 1, stated:

> "When a defendant challenges the sufficiency of the evidence, '"(t)he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (Citation.)' (Citations.) 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (Citation.)' (Citation.) We "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."'"' (People v. Clark (2011) 52 Cal.4th 856, 942–943.) "'Conflicts and even testimony (that) is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. (Citation.) We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. (Citation.)' (Citation.) A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (People v. Zamudio (2008) 43 Cal.4th 327, 357.)
>
> Here, the evidence showed three African–American men drove into the liquor store parking lot in a recently stolen Honda. They parked the Honda in the lot, got out, and disappeared behind a nearby wall. Approximately five minutes later, Johnson drove the Geo into the same parking lot. The victims arrived in the Ford approximately 30 seconds later. Johnson then backed out of the parking lot and onto the street. After pausing to make a gang hand sign, he drove forward and stopped the Geo near the wall behind which the three African–American men had previously disappeared. Three African–American men came out from behind the wall, and fired at least two guns at the victims, injuring Ibarra and killing Carmichael. The three men got into the back seat of the Geo and Johnson sped away.

A police sergeant and police helicopter pursued the vehicle until it stopped near a pedestrian path.  The three men in the back of the Geo got out of the passenger seat and ran toward the pedestrian path.  A short time later, police officers found a baseball cap, a do-rag, a gun, gloves and a shirt discarded along the route the men fled.  Although there was debris and trash along the route, each of these items appeared out of place and none bore indications of having been exposed to the elements for any length of time.

Ballistics evidence established the gun found along the path fired the bullet that killed Carmichael.  DNA found on the baseball cap and do-rag matched Grady's DNA.  The baseball cap is consistent with a baseball cap worn by one of the shooters.  In addition, as Grady concedes, eyewitness, cell phone, fingerprint, and other evidence conclusively established Martrell and Allen were two of the shooters.  Grady, Johnson, Martrell, and Allen were all members of the Neighborhood Crip gang and Grady had previously associated with Johnson and Martrell.  Grady was a possible contributor to a DNA mixture found on a comb in the Geo and he could not be excluded as a contributor to a DNA mixture found in the right rear passenger side of the Geo.  The shooter who wore the baseball cap had been sitting in this location before he got out of the Geo and fled along the pedestrian path.

A jury could reasonably infer from all of this evidence that Grady was one of the shooters, notwithstanding the lack of an eyewitness identification or a clear video image of him.  Accordingly, we conclude there is sufficient evidence to support Grady's convictions.

(Lodgment No. 6, <u>People v. Grady</u>, No. D057450, slip op. at 13-15.)

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  The Fourteenth Amendment's Due Process Clause is violated, and an applicant is entitled to federal habeas corpus relief, "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 324 (1979).  Federal habeas courts must analyze <u>Jackson</u> claims "with explicit reference to the substantive elements of the criminal offense as defined by state law." <u>Id.</u> at 324 n.16; <u>see also</u> <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) (holding that "a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.")  The Court must "apply the standards of <u>Jackson</u> with an additional layer of deference" when AEDPA applies, and can only grant relief if the state court's decision was objectively unreasonable. <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Court must ask whether the appellate court decision "reflected an unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of this case." <u>Id.</u> at 1275.

The jury in this case was presented with sufficient evidence to draw a reasonable inference that Petitioner was among the group of three men from which the shots were fired, that he was one of the shooters, and that he was in fact the person who shot and killed Carmichael. They were presented with forensic evidence indicating that two guns were used, and that a silver revolver was the murder weapon.  They were shown a video of a group of three men from which the shots were fired.  One of those men was identified by Ibarra as Martrell Johnson, who Ibarra said was a shooter and used a black revolver.  Mercedes Davis also identified Martrell, along with Michael Allen, as two of the three men who got into the back of a red Geo Prizm just after the shots were fired, shortly after cell phone records showed that Martray and Allen were in telephonic communication.  Davis testified that the third person was sitting behind her in the Geo wearing a hat, and was in possession of a silver revolver when he leapt from the Geo and ran. That person is seen in the video getting into the Geo behind Davis and wearing a hat with a logo, and possibly a "do-rag," similar to or identical to those later found containing Petitioner's DNA which had been recently discarded along the path taken by the men who ran from the Geo.  The hat containing Petitioner's DNA belonged to Gabriel Bidales and had been stolen less than 24 hours earlier by a man who generally matched Petitioner's description, and who Bidales had in fact initially tentatively identified as Petitioner, although the identification weakened over time. Petitioner argues that the hat and "do-rag" could have been discarded earlier, based on evidence that he did not have a car but got around by walking and the path was a 13 minute walk from his home.  However, those items were found in close proximity to the murder weapon, which allowed the jury to draw a reasonable conclusion that they had been discarded at the same time. Thus, sufficient evidence was presented at trial from which the jury could have reasonably found that Petitioner was not only among the group of three men from which the shots were fired, but, because he was in possession of the murder weapon immediately after it was fired, was in fact the person who shot and killed Carmichael.

The Court must, however, analyze <u>Jackson</u> claims with explicit reference to state law. <u>Jackson</u>, 443 U.S. at 324 n.16.  As defense counsel pointed out in closing argument, the jury was instructed that California law provides that if they could draw two reasonable inferences from

circumstantial evidence, one of innocence and one of guilt, they were required to choose innocence, provided they accept only reasonable conclusions and reject any unreasonable ones. (RT 1937.)  Petitioner contends the jury could have reasonably found that Bidales' hat, which was found along the escape path containing DNA only from Petitioner and Bidales, was not the hat seen in the video.  He contends that the hat found along the path, which had been stolen less than 24 hours earlier from Bidales, may have acquired Petitioner's DNA and been discarded along the path prior to the shooting, either by Petitioner, who lived within walking distance of the path and got around by walking, or by one of his friends with whom he shared clothing. Such a conclusion would not be reasonable, however, as it would require the jury to find that the hat seen in the video had <u>not</u> been discarded along the path by the trio of shooters when they discarded the murder weapon and the rest of the distinctive clothing they were seen wearing in the video, but had disappeared without a trace, and that Bidales' hat had been, coincidentally, discarded hours earlier along the same path in, coincidentally, close proximity to where the murder weapon and the other items linked to the shooting were discarded hours later.

Petitioner also contends that the jury could have reasonably found that, if Bidales' hat was the hat shown in the video, it had acquired Petitioner's DNA sometime after it was stolen, perhaps when Petitioner had worn it earlier that day or the previous night, and it was thereafter worn during the shooting by the third man whom Ibarra and Davis were unable to identify.  That conclusion is urged here, as it was by defense counsel at trial, based on Ibarra's ability to identify Martray, Martrell and Davis but not Petitioner, and because Davis identified Martray and Martrell in violation of her gang code of silence but not Petitioner despite the testimony of the gang expert that Petitioner associated with Martray and Martrell.  However, Ibarra identified Martray and Davis before the shooting, when the atmosphere in the parking lot was relatively calm, and he identified Martrell as the first shooter just before he dove to the ground.  Ibarra was on the ground when the man the man wearing Bidales' hat came around the corner and fired the murder weapon.  That man was seated directly behind Davis, in a position, unlike the other two men she identified, where it would have been difficult for her to see his face, which in any case was partially obscured by a hat.  The jury obviously rejected Petitioner's unlikely scenarios, and,

consistent with their instruction, found that no reasonable inference of innocence could be drawn from the circumstantial evidence that DNA from Petitioner and Bidales, and no one else, was found on Bidales' hat, which had been stolen hours earlier by a man who Bidales said resembled Petitioner, and which resembled the hat seen in the video worn by the person Mercedes Davis said exited the car in possession of the murder weapon and ran away along a path where the murder weapon was found in close proximity to the hat and several other discarded items of clothing worn during the shooting by Allen and Martrell.  See Francis v. Franklin, 471 U.S. 307, 324 n.9 (1985) ("The Court presumes that jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, makes sense of, and follow the instructions given them.")

Even if Petitioner could persuasively argue here that the jury could have drawn a reasonable inference of innocence from the circumstantial evidence, as his trial counsel robustly attempted to convince them to do, the jury obviously did not draw such an inference, and this Court is not in a position to second guess their reasonable determination that the only reasonable conclusion to be drawn from all the evidence, which included not just the circumstantial evidence but the direct video evidence, was that Petitioner was among the group of three men from which the shots were fired.  See Jackson, 443 U.S. at 319, 324 (holding that federal habeas courts must consider the evidence "in the light most favorable to the prosecution," and must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming the jury resolved all conflicts in a manner that supports the verdict).  Given the "additional layer of deference" owed to the state appellate court opinion under AEDPA, the Court finds that habeas relief is not available because that opinion does not reflect "an unreasonable application of Jackson and Winship to the facts of this case." Juan H., 408 F.3d at 1274-75.  The Court also finds that the state court adjudication of the claim did not involve an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, because Petitioner has not demonstrated that the state court factual findings are objectively unreasonable.  Miller-El, 537 U.S. at 340.

An evidentiary hearing is not necessary where, as here, the federal claim can be denied on the basis of the state court record, and where the petitioner's allegations, even if true, do not provide a basis for habeas relief.  Campbell v. Wood, 18 F.3d 662, 679 (9th Cir. 1994). Furthermore, because Claim 1 was adjudicated on the merits in state court, this Court must make its § 2254(d) determination based solely on the evidence presented to the state court.  Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011).  Petitioner can only proceed to develop additional evidence in federal court if § 2254(d) is satisfied, which it has not been with respect to Claim 1, or, possibly, if there is new evidence which transforms an already-exhausted claim into a new claim which has not been adjudicated on the merits in the state court, in which case § 2254(d) arguably would not apply.  Id. at 1401 n.10; Stokley v. Ryan, 659 F.3d 802, 808-09 (9th Cir. 2011).  Petitioner has not come forward with any new evidence supporting this claim. Even assuming his allegation that alibi witnesses were available but not called to testify could constitute new evidence in this context, as discussed below, Petitioner has not, either here or in the state court, identified those witnesses or provided their affidavits or declarations, and has not called into question the state court finding that trial counsel interviewed them and found they were unable to provide an alibi for the time of the shooting.  Thus, an evidentiary hearing is neither necessary nor warranted to address Claim 1.

Petitioner contends that appointment of counsel is warranted based on Respondent's acknowledgment that the evidence against him was circumstantial.  (Traverse at 4.)  The Sixth Amendment right to counsel does not extend to federal habeas corpus actions by state prisoners. McCleskey v. Zant, 499 U.S. 467, 495 (1991); Chaney v. Lewis, 801 F.2d 1191, 1196 (9th Cir. 1986); Knaubert v. Goldsmith, 791 F.2d 722, 728 (9th Cir. 1986).  Financially eligible habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may obtain representation whenever the court "determines that the interests of justice so require."   18 U.S.C. § 3006A(a)(2)(B); Terrovona v. Kincheloe, 912 F.2d 1176, 1181 (9th Cir. 1990); Bashor v. Risley, 730 F.2d 1228, 1234 (9th Cir. 1984).  The interests of justice require appointment of counsel when the court conducts an evidentiary hearing on the petition or utilizes the discovery process.  Terrovona, 912 F.2d at 1177; Knaubert, 791 F.2d at 728;  Rule 8(c), 28 U.S.C. foll. § 2254; Rule 6(a), 28 U.S.C.

foll. § 2254.  The appointment of counsel is discretionary where no evidentiary hearing or discovery is necessary.  Terrovona, 912 F.2d at 1177; Knaubert, 791 F.2d at 728.

"Indigent state prisoners applying for habeas relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations."  Chaney, 801 F.2d at 1196; Knaubert, 791 F.2d at 728-29.  A due process violation may occur in the absence of counsel if the issues involved are too complex for the petitioner.  However, it appears that Petitioner has a good grasp of this case and the legal issues involved.  Under such circumstances, there is no abuse of discretion in denying a state prisoner's request for appointment of counsel, as it is simply not warranted by the interests of justice.  See LaMere v. Risley, 827 F.2d 622, 626 (9th Cir. 1987).  Where, as here, "the issues involved can be properly resolved on the basis of the state court record, a district court does not abuse its discretion in denying a request for court-appointed counsel."  Hoggard v. Purkett, 29 F.3d 469, 471 (8th Cir. 1994).  The Court finds that the "interests of justice" do not warrant the appointment of counsel as to any claim presented in this case.

Accordingly, the Court finds that neither an evidentiary hearing nor appointment of counsel is necessary or warranted with respect to Claim 1.  The Court finds that the state court adjudication of Claim 1 is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.  The Court therefore **RECOMMENDS** habeas relief be **DENIED** as to Claim 1.

**C.    Claim 2**

Petitioner alleges in Claim 2 that he was denied his Fourteenth Amendment rights to due process and a fair trial because it is not possible to determine which theory of attempted murder the jury chose, and they may have convicted him under the theory of conspiracy to commit attempted murder.  (Pet. at 5, 21, 35-39.)  He contends that the state courts have invalidated that crime because the mental states necessary for conspiracy, intent to agree to commit a crime and intent to commit a crime, are incompatible with attempted murder, which requires an intent to commit murder coupled with an ineffectual act toward its commission, as it is not possible to simultaneously intend to commit murder and intend to commit an ineffectual act.  (Id.)

Respondent answers that the state appellate court's denial of this claim, on the basis that any instructional error is clearly harmless, is neither contrary to, nor involves an unreasonable application of, clearly established federal law. (Ans. Mem. at 34-39.)  Petitioner replies that the instructional error is not harmless because it lowered the prosecution's burden of proof, which is exacerbated by the fact that there is only circumstantial evidence against him, and requests an evidentiary hearing.  (Traverse 6-7.)

The Court will look through the silent denial of this claim by the state supreme court to the appellate court opinion, which stated:

> The trial court instructed the jury on seven separate theories upon which the jury might find Grady guilty of attempted murder.  These theories were:
>
> 1.     Grady directly perpetrated attempted murder.
>
> 2.     Grady aided and abetted attempted murder.
>
> 3.     Grady conspired to commit attempted murder.
>
> 4.     Grady was guilty of shooting at an occupied motor vehicle, during the commission of that crime a coparticipant committed attempted murder, and the attempted murder was the natural and probable consequence of the shooting at an occupied vehicle.
>
> 5.     Grady was guilty of assault with a firearm, during the commission of that crime a coparticipant committed attempted murder, and the attempted murder was the natural and probable consequence of the assault with a firearm.
>
> 6.     Grady aided and abetted either a shooting at an occupied motor vehicle or an assault with a firearm and the attempted murder was a natural and probable consequence of those crimes.
>
> 7.     Grady conspired to commit a shooting at an occupied motor vehicle or assault with a firearm, a member of the conspiracy committed attempted murder in furtherance of the conspiracy, and the attempted murder was a natural and probable consequence of the common plan or design of the shooting at an occupied motor vehicle or assault with a firearm.
>
> Grady contends we must reverse his attempted murder convictions because one of these theories, that he conspired to commit attempted murder, is invalid under *People v. Iniguez* (2002) 96 Cal.App.4th 75, 77 (reversing a conviction for conspiracy to commit attempted murder after concluding the mental states required for conspiracy and attempted murder are incompatible). Assuming, without deciding, an instructional error occurred, we conclude it does not require reversal of Grady's attempted murder convictions.
>
> "When the prosecution presents its case to the jury on alternate theories, one of which is legally correct and the other legally incorrect, 'we must reverse the conviction unless it is beyond a reasonable doubt that the error did not contribute to the jury's verdict. (Citations.)   Such a reasonable doubt arises

where, although the jury was instructed on alternate theories, there is no basis in the record for concluding that the verdict was based on a valid ground. (Citations.)'  (Citation.) 'An instructional error presenting the jury with a legally invalid theory of guilt does not require reversal, however, if other parts of the verdict demonstrate that the jury necessarily found the defendant guilty on a proper theory.'"  (*People v. Calderon* (2005) 129 Cal.App.4th 1301, 1306–1307, fn. omitted; accord, *Hedgpeth v. Pulido* (2008) 555 U.S. 57, 58; *People v. Farley* (2009) 46 Cal.4th 1053, 1116, fn. 22.)

Here, the jury's guilty verdicts on the conspiracy to commit murder and the shooting at an occupied vehicle charges, coupled with its findings that the attempted murders were willful, deliberate, and premeditated, its findings on the firearm enhancement allegations, and its findings on the gang benefit enhancement allegations, show the jury agreed on all of the elements necessary for convicting Grady of attempted murder under any of the aiding and abetting theories as well as under the theory he conspired to commit a shooting at an occupied vehicle that naturally and probably resulted in an attempted murder. We, therefore, conclude any error in instructing Grady [sic] on conspiracy to commit attempted murder was harmless beyond a reasonable doubt.

(Lodgment No. 6, <u>People v. Grady</u>, No. D057450, slip op. at 15-17.)

Clearly established federal law provides that where a jury is instructed on multiple theories of guilt, one of which is legally incorrect, a federal habeas court must determine whether "the flaw in the instructions 'had a substantial and injurious effect or influence in determining the jury's verdict.'"  <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 58 (2008), quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).  This Court does not make a determination whether the state appellate court's harmless error determination is contrary to or an unreasonable application of clearly established federal law, but applies the <u>Brecht</u> test for harmlessness in the first instance.  <u>Dixon v. Williams</u>, 750 F.3d 1027, 1034-35 (9th Cir. 2014).

The application of <u>Brecht</u>'s "substantial and injurious effect" standard "protects the State's sovereign interest in punishing offenders and its good-faith attempts to honor constitutional rights . . . while insuring that the extraordinary remedy of habeas corpus is available to those whom society has grievously wronged."  <u>Calderon v. Coleman</u>, 525 U.S. 141, 145 (1998) (internal citations and quotation marks omitted).  "Under this standard, an error is harmless unless the "record review leaves the conscientious judge in grave doubt about the likely effect of an error . . . (i.e.,) that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'"  <u>Padilla v. Terhune</u>, 309 F.3d 614, 621-22 (9th Cir. 2002), quoting <u>O'Neal v. McAninch</u>, 513 U.S. 432, 435 (1995) and

citing Kotteakos v. United States, 328 U.S. 750, 765 (1946) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.")

As the state appellate court here pointed out, the jury obviously agreed on all the elements necessary for attempted murder under any of the aiding and abetting theories, or under the theory that Petitioner conspired to shoot at an occupied vehicle which naturally and probably resulted in an attempted murder, because they found him guilty of first degree murder, conspiracy to commit murder, and shooting at an occupied vehicle, and found that the attempted murders were willful, deliberate, and premeditated. There is certainly nothing in the record to suggest the jury was confused or misled by the attempted murder instruction in any manner whatsoever, much less to the point where they may have found Petitioner guilty on less than proof beyond a reasonable doubt that he had the specific intent to murder Washington, Westbrook and Ibarra. Additionally, the prosecutor argued during closing (see RT 2002-04, 2009-12), that the defendants' actions during the conspiracy amounted to a planned, premeditated attempt to murder the people in the Probe, and that they possessed an intent to kill, particularly given their success in murdering one of the men in the Probe. See Middleton v. McNeil, 541 U.S. 433, 438 (2004) (argument of counsel, particularly that of the prosecutor, may resolve an ambiguous jury instruction).

The Court finds that habeas relief is not available with respect to Claim 2 because any error in instructing the jury regarding conspiracy to commit attempted murder could not have had "a substantial and injurious effect of influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Pulido, 555 U.S. at 58. An evidentiary hearing is neither necessary nor warranted because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell, 18 F.3d at 679; Pinholster, 131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09. Accordingly, the Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 2.

/ / /

-29-

13cv2479

**D.     Claim 3**

Petitioner alleges in Claim 3 that he was denied his rights to due process and a fair trial as protected by the Sixth and Fourteenth Amendments to the United States Constitution when the trial court instructed the jury on the "kill zone" theory of attempted murder, thereby allowing conviction without evidence that Petitioner had the specific intent to kill each victim.  (Pet. at 5, 21, 40-45.)  Respondent answers that to the extent Petitioner alleges only an error of state law, the claim does not present a federal question.  (Ans. Mem. at 42.)  Respondent alternately contends that the state appellate court's denial of the claim, on the basis there was no error, is neither contrary to nor involves an unreasonable application of clearly established federal law. (Ans. Mem. at 39-44.)  Petitioner replies that the gang allegations, coupled with the kill zone instruction, and the bombardment of the jury with multiple theories of crimes, was prejudicial, because the jury must have presumed he was guilty of something.  (Traverse at 8-9.)

The Court will look through the silent denial of this claim by the state supreme court and apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> As part of its instructions on attempted murder, the trial court informed the jury of the "kill zone" theory of specific intent contained in CALCRIM No. 600. Specifically, the trial court informed the jury, "A person may intend to kill a specific victim or victims and, at the same time, intend to kill everyone in a particular zone of harm or kill zone.  In order to convict the defendant of attempted murder of (Ibarra, Washington, and Westbrook), the People must prove the defendant not only intended to kill (Carmichael), but also intended to kill everybody within . . . the kill zone.  (¶)  If you have a reasonable doubt whether the defendant intended to kill (Ibarra, Washington, and Westbrook) or intended to kill (Carmichael) by killing everybody in the kill zone, then you must find the defendant not guilty of the attempted murder of (Ibarra, Washington, and Westbrook)."
>
> Grady contends the trial court's instruction on the kill zone theory was prejudicially misleading.  We disagree.
>
> The California Supreme Court first articulated the kill zone theory in *People v. Bland* (2002) 28 Cal.4th 313 (*Bland* ).  The Supreme Court started from the premise that "(t)o be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.  The defendant's mental state must be examined as to each alleged attempted murder victim.  Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others."  (*Id.* at p. 328.)
>
> The Supreme Court then explained, "the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what it termed the 'kill zone.'  'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary

victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, . . . consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the fact finder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone." (*Bland*, *supra*, 28 Cal.4th at pp. 329–330.)

While recognizing the Supreme Court articulation of the kill zone theory is controlling, Grady contends the trial court's kill zone instruction was misleading because it gave the jury an improper either/or choice that allowed the jury to convict Grady of attempted murder without finding he specifically intended to kill Ibarra, Westbrook, and Washington. Grady bases this argument on a version of the instruction quoted in his brief. Grady's version states in part, "In order to convict the defendant of the attempted murder of (Ibarra, Westbrook, and Washington), the People must prove that the defendant not only intended to kill (Carmichael), but also either intended to kill (Ibarra, Westbrook, and Washington), or intended to kill anyone within the kill zone." (Emphasis in original.) Grady asserts this latter language allowed the jury to "find specific intent as to Ibarra, Westbrook, and Washington, or intent to kill all the individuals in the area, but if it chose the latter, it was not required to find (Ibarra, Westbrook, and Washington) were inside the 'kill zone.'" Thus, according to Grady, the "language improperly and unconstitutionally substitutes an inference of intent for the actual intent element."

In this case, we fathom no circumstances upon which the jury could find Grady guilty of attempted murder under a 'kill zone' theory and not find the victims were all within the kill zone, as one of the victims was inside the car Grady and his accomplices shot at and the other two were standing right next to it. More importantly, however, we have quoted the relevant portion of the trial court's kill zone instruction above. The either/or language Grady complains of is not present in the instruction. Rather, the trial court's instruction clearly informed the jury that, "(i)n order to convict the defendant of the attempted murder of (Ibarra, Washington, and Westbrook), the People must prove that the defendant not only intended to kill (Carmichael), but also intended to kill everybody within . . . the kill zone." This instruction is wholly consistent with the Supreme Court's guidance in *Bland*. Accordingly, Grady has not established the trial court's instruction was misleading, much less prejudicially so.

Grady additionally contends the trial court's instruction was biased as it improperly incorporated and endorsed argumentative terms, such as "zone of harm" and "kill zone." This same issue was addressed by the appellate court in *People v. Campos* (2007) 156 Cal.App.4th 1228 (*Campos*). The *Campos* court rejected the argument reasoning, "(a)n instruction is argumentative when it recites facts drawn from the evidence in such a manner as to constitute argument to the jury in the guise of a statement of law. (Citation.) 'A jury instruction is (also) argumentative when it is "'of such a character as to invite the jury to draw

inferences favorable to one of the parties from specified items of evidence.'"' (*Id.* at p. 1244)

"CALCRIM No. 600 merely employs a term, 'kill zone,' which was coined by our Supreme Court in *Bland* and referred to in later California Supreme Court cases. (Citation.)  It does not invite inferences favorable to either party and does not integrate facts of this case as an argument to the jury.  Other disparaging terms, including 'flight' (citation), 'suppress(ion) of evidence' (citation) and 'consciousness of guilt' (citation) have been used in approved, longstanding (jury) instructions.  We see nothing argumentative in this instruction." (*Campos, supra,* 156 Cal.App.4th at p. 1244.)  We agree with the *Campos* court's conclusion.

(Lodgment No. 6, <u>People v. Grady</u>, No. D057450, slip op. at 18-21.)

Clearly established federal law provides that in order to merit relief on an instructional error claim such as this, Petitioner must show the error "by itself so infected the entire trial that the resulting conviction violates due process."  <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991), quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147 (1973).  The Court must "inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." <u>McGuire</u>, 502 U.S. at 72, quoting <u>Boyde v. California</u>, 494 U.S. 370, 380 (1990).  The allegedly erroneous instruction must be considered in the context of the trial record and the instructions as a whole.  <u>McGuire</u>, 502 U.S. at 72; <u>Cupp</u>, 414 U.S. at 146-47.

As the state appellate court noted, Petitioner's contention that the challenged instruction allowed the jury to convict him without proof of intent to kill is without merit because "the trial court's instruction clearly informed the jury that, '(i)n order to convict the defendant of the attempted murder of (Ibarra, Washington, and Westbrook), the People must prove that the defendant not only intended to kill (Carmichael), but also intended to kill everybody within . . . the kill zone.'" (Lodgment No. 6, <u>People v. Grady</u>, No. D057450, slip op. at 20.)  Petitioner's contention that there was no evidence that he targeted or intended to kill each victim is without merit for the reasons discussed above with respect to Claims 1 and 2.  The jury obviously found that he was one of the three men who are seen in the video emerging from the area where the three men in the stolen Honda had gone, and who are then seen shooting at the car which Washington and Ibarra are standing next to and in which Westbrook and Carmichael are seated.  The Probe sustained bullet damage to the window and tire, Ibarra and Carmichael were struck by bullets, and there was evidence that the shooters knew how many people were in the Probe,

and may have even known who they were, because the driver of the getaway car spoke on the telephone with one of the men in the group of shooters several times within 90 seconds of the shooting.  That evidence, coupled with the fact the jury convicted Petitioner of murdering Carmichael and of shooting at an inhabited vehicle, belie any argument that there was insufficient evidence that Petitioner targeted or intended to kill the occupants of the vehicle, irrespective of whether they were merely all in the "kill zone" or if Petitioner individually targeted each person.  Given that the kill zone was so compact, as Ibarra was shot at the front of the Probe and Carmichael shot while in the back seat, there is simply no basis to support a finding of "a reasonable likelihood that the jury . . . applied the challenged instruction in a way that violates the Constitution," based on allowing the jury to find that Petitioner attempted to murder three of the four men in the black Probe (the fourth being Carmichael who was in fact murdered) either because he specifically targeted each of them individually or because they were in the kill zone created around Carmichael.  Middleton, 541 U.S. at 436-37; see also McGuire, 502 U.S. at 72 (holding that federal habeas courts must "bear in mind our previous admonition that we 'have defined the category of infractions that violate 'fundamental fairness' very narrowly."), quoting Dowling v. United States, 493 U.S. 342, 352 (1990) ("Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation.") Accordingly, the Court finds that the state court adjudication of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts.

Furthermore, any error is clearly harmless.  By convicting Petitioner of murdering Carmichael the jury found that he had the specific intent to kill Carmichael when he shot at the car, or, if the jury did not find that he was a shooter, that he aided and abetted the shooter who murdered Carmichael with deliberation and premeditation.  Although the evidence showed that Carmichael was the only gang member in the Probe, and that the shooters were in a position to know that both from the cell phone evidence and their vantage point, there was no evidence Carmichael was the only person specifically targeted.  Rather, Ibarra was shot while at the opposite end of the Probe from Carmichael.  In addition, the gang expert testified that gang

retaliation murders such as this one typically target young Black males who look as if they are gang members, irrespective of whether they are.  (RT 1801.)  Because Petitioner engaged in the same conduct which resulted in the murder of Carmichael as he did with the attempted murder of Ibarra, Washington and Westbrook, who were in very close proximity to Carmichael when they were shot at (and in Ibarra's case hit while he was lying on the ground), instructing the jury that they could find Petitioner harbored the specific intent to attempt to kill those three men because they were in a kill zone established around Carmichael, rather than specifically targeting each individual, could not have had "a substantial and injurious effect of influence in determining the jury's verdict." Brecht, 507 U.S. at 637; Pulido, 555 U.S. at 58; see also Griffin v. United States, 502 U.S. 46, 56 (1991) (holding that where a prosecutor puts multiple theories of guilt to a jury, one of which is factually unsupported, the jury may be trusted to have relied on the theory that is supported by the evidence.)

An evidentiary hearing is neither necessary nor warranted because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief.  Campbell, 18 F.3d at 679; Pinholster,131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09.  Accordingly, the Court finds that the state court adjudication of Claim 3 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, was not based on an unreasonable determination of the facts, and that any error is harmless.  The Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 3.

**E.   Claim 4**

Petitioner alleges in Claim 4 that he was denied his Fourteenth Amendment rights to due process and a fair trial by the admission of the testimony of the forensic video analyst because it invaded the province of the jury to determine what was depicted on the videos.  (Pet. at 5-6, 22, 46-51.)  Respondent answers that this claim does not present a federal question, and in any case the state appellate court's denial of the claim, on the basis that there was no error because the testimony had the potential to assist the jury and that any error was harmless, does not involve an unreasonable application of clearly established federal law.  (Ans. Mem. at 44-46.) Petitioner replies that the expert gave more than technical assistance regarding the effects of

light, shadow, reflections, distortion and perspective, as found by the state appellate court, but rendered prejudicial testimony regarding his opinion that Petitioner was identifiable as one of the shooters in the very poor quality video. (Traverse at 10-11.)

The Court will apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

> Grady contends the trial court prejudicially erred and deprived him of his constitutional right to a fair trial by admitting the forensic video analyst's testimony because the testimony involved matters that were not beyond the common experience of the jurors. "We review the trial court's ruling on the admissibility of expert testimony for abuse of discretion." (*People v. Watson* (2008) 43 Cal.4th 652, 692; *People v. Dejourney* (2011) 192 Cal.App.4th 1091, 1110.) We discern no abuse of discretion in this case.
>
> "(A)lthough expert testimony is generally inadmissible on topics 'so common' that jurors of ordinary knowledge and education could reach a conclusion as intelligently as the expert, an expert may testify on a subject about which jurors are not completely ignorant. (Citations.) In determining the admissibility of expert testimony, 'the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury.'" (*People v. Lindberg* (2008) 45 Cal.4th 1, 45; accord, *People v. Prince* (2007) 40 Cal.4th 1179, 1222.)
>
> Here, the forensic video analyst provided expert testimony in several key areas. He explained how the liquor store's and police helicopter's video systems captured images, and how he separated and sequenced the liquor store's video for easier viewing. He also explained how light and reflections influence the recording and the appearance of the people, objects, and colors in the images. He then made still shots of some of the images, highlighted certain light and dark areas, and related to the jury what he believed those light and dark areas represented. Grady disputes only the propriety of this latter testimony on appeal.
>
> We note some of the expert's conclusions, such as that the third person who got out of the stolen Honda was wearing a black and white checkered shirt or jacket, were equally apparent on both the video and the still shots. Others of his conclusions, such as that all three men in the stolen Honda were wearing gloves and the third person who exited the car was wearing a cap consistent with the one found along the pedestrian path, were more apparent on the still shots, but also apparent on the video. Still others of his conclusions, such as that the three men who got out of the Honda and went behind the wall were wearing clothing consistent with the clothing worn by the three men who got into the backseat of the Geo, were more apparent on the video than on the still shots. This latter conclusion was also readily inferable from the sequence and timing of events. Consequently, as both parties point out in their briefs, the jury could have theoretically gleaned the same information imparted by the expert from merely viewing the video.
>
> This does not mean, however, the trial court unreasonably determined the expert's testimony would assist the jury. As the trial court noted when it decided to allow the expert to testify, such technical matters as the influence of light, reflection, camera angles, and recording errors on video images are well outside a jury's common experience. The expert's testimony in these areas undoubtedly helped the jury to identify what portions of the video evidence required closer

-35-

examination, and to interpret some of the less obvious information conveyed by the video evidence.  We, therefore, conclude the trial court did not abuse its discretion in admitting the expert's testimony. (See *Stevenson v. State* (Tex. 2010) 304 S.W.3d 603, 623 (*Stevenson*) (forensic video analyst's testimony admissible to help clarify the images obtained from a poor-quality, black-and-white video); see also *United States v. Sellers* (4th Cir. 1977) 566 F.2d 884, 886 (expert's testimony admissible to explain the effects of light, shadow, reflections, distortion from perspective, and other technical factors on surveillance photograph).) [Footnote: The *Stevenson* case involved testimony from the same forensic video analyst who testified in this case.  (*Stevenson*, *supra*, 304 S.W.3d at p. 609.)]

Even if the trial court had erred in admitting the expert's testimony, we agree with the People that the error was harmless.  As we have noted *ante*, the expert's specific conclusions about the information imparted in the video were either readily apparent or readily verifiable from viewing the video.  We, therefore, conclude it is not reasonably probable the verdict would have been more favorable to Grady absent the claimed error. (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also *People v. Hernandez* (1977) 70 Cal.App.3d 271, 281 (error in admitting expert testimony is harmless if the testimony adds nothing to what is otherwise apparent to the jury).)

(Lodgment No. 6, <u>People v. Grady</u>, No. D057450, slip op. at 22-24.)

Claims based on state evidentiary rulings are not cognizable in a federal habeas proceeding unless the admission of the evidence was so prejudicial that it rendered a trial fundamentally unfair.  <u>McGuire</u>, 502 U.S. at 70-73; <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 897 (9th Cir. 1996).  Although Respondent contends that this claim does not present a federal question because it alleges an error of state law in the introduction of the evidence, "[t]he issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point." <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991) ("While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally fair manner, it is certainly possible to have a fair trial even when state standards are violated; conversely, state procedural and evidentiary rules may countenance processes that do not comport with fundamental fairness.")

Although the Ninth Circuit has found federal error in the admission of expert testimony which invades the province of the jury to determine the defendant's mental state (<u>see e.g.</u> <u>United States v. Morales</u>, 108 F.3d 1031, 1038 (9th Cir. 1997) (en banc)), and the credibility of witnesses (<u>see e.g.</u> <u>United States v. Amaral</u>, 488 F.2d 1148, 1153 (9th Cir. 1973)), such authority does not establish "clearly established federal law" providing that a federal due process violation

can arise from the introduction of expert testimony regarding what is depicted on a video. See Woodall, 134 S.Ct. at 1706 (holding that "if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not 'clearly established at the time of the state-court decision.'"), quoting Yarborough v. Alvarado, 541 U.S. 652, 666 (2004). The Supreme Court has stated that § 2254(d)(1) does not require an "identical factual pattern before a legal rule must be applied." Woodall, 134 S.Ct. at 1706, quoting Panetti v. Quarterman, 551 U.S. 930, 953 (2007). Rather, "relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Woodall, 134 S.Ct. at 1706-07, quoting Richter, 131 S.Ct. at 787. Petitioner has identified no "clearly established federal law" which provides that the introduction of the testimony of the forensic video analyst could rise to the level of a federal due process violation. Id.

Even assuming clearly established federal law provides that the introduction of testimony of a forensic video analyst can rise to the level of a due process violation, given the broad discretion which this Court owes the state court opinion, it is clear that the state appellate court's determination that there was no error in the admission of the expert's testimony is neither contrary to, nor involved an unreasonable application of, that federal law. See Woodall, 134 S.Ct. at 1705 (holding that state courts have broad discretion where the precise contours of the right remains unclear). The jury viewed the video and the still photographs generated from it and were in a position to determine for themselves whether Petitioner was one of the shooters, or whether one of the shooters was wearing the hat or "do-rag" containing Petitioner's DNA found along their escape path. This Court owes deference to the appellate court's factual finding that the expert assisted the jury regarding technical matters, and that any specific conclusions the expert drew were readily apparent or readily verifiable from viewing the video. In addition, evidence independent of the video was available for the jury to determine whether Petitioner was one of the shooters, including that a hat stolen less than 24 hours earlier during a carjacking, which contained DNA only from Petitioner and the carjack victim, was found in close proximity to the murder weapon and other items of discarded clothing containing DNA from the other two

men involved in the shooting.  The carjack victim initially identified Petitioner, and although the identification weakened over time, he maintained that one of the carjackers resembled Petitioner. The carjack victim also identified the second carjacker as Martrell Johnson, and said he brandished a silver revolver similar to the murder weapon.  Martrell was identified by Ibarra as one of the shooters, and by Davis as one of the men who jumped in the back of the Geo.  Thus, the expert's opinion, given while the jury was watching the video and viewing photographic stills, all of which were available to them during their deliberations, that he saw similarities in the hat worn by one of the shooters and the hat found on the path, or that he agreed with the prosecutor that the knot on the back of the head on the man wearing the hat was consistent with a "do-rag," did not remove from the jury's province the ultimate issue of whether Petitioner was one of the shooters and whether he harbored the necessary intent to kill.  See Morales, 108 F.3d at 1038 (finding no error "so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony.")

Even assuming an error occurred, it would in any case be harmless because there is no basis for finding that an error in admitting the expert's testimony could have had a substantial or injurious effect or influence on the jury's verdict.  The jury watched the video and were provided with still photographs taken from the video, and were able to determine for themselves what was depicted on the video.  Corroborative evidence was presented in the form of Bidales' identification of Petitioner as the man, or as resembling the man, who stole his hat during a carjacking less than 24 hours before the shooting, which contained DNA only from him and Petitioner, and in the form of Bidales' identification of Martrell Johnson as the man who brandished a silver revolver during the carjacking which matched the murder weapon, and who was identified by Ibarra and Davis as one of the shooters.  Thus, the Court finds that the admission of the forensic video analyst's testimony was not so prejudicial that it rendered the trial fundamentally unfair, and that any error in admitting the evidence was harmless.  Woodall, 134 S.Ct. at 1705; Brecht, 507 U.S. at 637; McGuire, 502 U.S. at 70-73; Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919.  It is also clear that a review of the state appellate court opinion

above reveals that the adjudication of this claim is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, because Petitioner has not demonstrated that the state court factual findings are objectively unreasonable. Miller-El, 537 U.S. at 340.

The state court adjudication of Claim 4 is not contrary to, and does not involve an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts. The Court alternately finds that any error was harmless. An evidentiary hearing is neither necessary nor warranted because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell, 18 F.3d at 679; Pinholster,131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09. The Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 4.

## F.    Claim 5

Petitioner alleges in Claim 5 that he was denied his rights to due process and a fair trial as protected by the Sixth and Fourteenth Amendments when Mercedes Davis was allowed to testify regarding her fear of retaliation, in particular regarding the vandalism to her mother's car, because her testimony was irrelevant, as there is no evidence Petitioner was responsible for her fear and no indication her fear influenced her testimony. (Pet. at 6, 22, 52-59.) Respondent answers that a claim of state law error does not present a federal question, but that in any case the state appellate court's denial of the claim, on the basis that it is absurd to suggest there was no basis to inquire whether Davis was afraid to testify and that any error was harmless, is neither contrary to nor involves an unreasonable application of clearly established federal law. (Ans. Mem. at 46-55.) Petitioner presents additional claims in his Traverse arguing that the error, even if harmless, should be viewed in the context of the other trial errors to find cumulative error, and alleging that his trial counsel rendered ineffective assistance by answering, "Yes, your Honor," when asked by the trial court, "Does that work?" after the trial judge ruled the evidence would be admissible with a limiting instruction. (Traverse at 12.)

The prosecutor sought admission of evidence that Mercedes Davis feared retaliation from testifying at trial on the basis that she had testified in her pre-trial conditional examination (held

to determine whether she had a Fifth Amendment right not to testify), that she had been sent out of state to live with relatives after the tires on her mother's car had been slashed, and a fire set on the car's window, just after Mercedes had given her police statement and before any of the defendants, other than Martray, were in custody.  (CT 234-35.)  The prosecutor argued that the threats explained Mercedes' reluctance to testify, her fear of doing so, why her testimony differed from her statement to the police, and why she seemed unable to recall key facts.  (CT 235.)  The trial judge voiced concern regarding how the evidence could be admitted without, "crossing the lines so the jurors don't think that [Petitioner] is the one vandalizing the cars since there is no proof he was involved in that?"  (RT 556.)

Defense counsel argued that there was no indication that Davis was afraid to testify, and that a more plausible reason why she was unable to remember key facts or identify any of the three men who were in the group that fired the shots, despite having identified Allen and Martrell in her police statement, was that during her police statement she was at first unable to identify any of the men, and she only identified Martrell and Allen after the police threatened to charge her with being an accessory.  (RT 556-57.)  Defense counsel indicated that Mercedes was not a particularly bad witness against Petitioner because she had not identified him, but counsel expressed concern that the jury might assume Petitioner had something to do with the vandalism, and argued that the connection between the vandalism and the shootings was speculative.  (RT 557-58.)  The trial judge stated:

> I'm inclined to let it in for a limited purpose with a jury instruction regarding that it is simply to show her mental state; and that there is no proof that [Petitioner] was involved in slashing tires or setting fires.  Because I really want to draw that line so that it is not misused by the jury.  [¶]  I think that the jury has a right to see what is going through her brain.  If that is a factor that influences what she testifies to and how she testifies, then that should be brought out.  On the other hand, I don't want it to reflect poorly on the defendant.  So why don't we do that.  If you two can't agree on the language of the instruction, then I'll write it.  [¶]  But I want to be very clear that it is a limited purpose.  So with that you can start with that instruction for CALCRIM, and we'll modify it to include that it is simply to show her mental state; and that there is no proof tying [Petitioner] to the vandalism.  Does that work?

(RT 559-60.)  Petitioner's counsel answered: "Yes, your Honor."  (RT 560.)

/ / /

1    The jury was eventually instructed:

2         During the trial, evidence that in the first week of November 2008, Angela
     Morris, the mother of Mercedes Davis, testified that on a separate occasion the
3    tires of her car had been slashed and a fire had been started on the windshield of
     her car has been admitted for a limited purpose of how this evidence may affect
4    the state of mind of witness Mercedes Davis when she testified in court.  You may
     consider that evidence only for the limited purpose and for no other purpose.  As
5    no evidence has been provided linking the defendant, Marquise Grady, to these
     incidents, you are not to consider this evidence as related to the defendant,
6    Marquise Grady.

7    (RT 1940-41.)

8         Petitioner argued in state court that the evidence was irrelevant, and admitted for the

9    improper purpose of suggesting Petitioner had threatened Davis, because he was not linked to

10   the vandalism and there was no evidence that her equivocation was caused by fear of retaliation

11   rather than poor memory.  (Lodgment No. 3 at 57-66; Lodgment No. 7 at 33-40.)

12        The Court will look through the silent denial of this claim by the state supreme court and

13   apply 28 U.S.C. § 2254(d) to the appellate court opinion, which stated:

14        Near the conclusion of her direct examination testimony, Davis admitted
     she was worried and did not want to testify because "things happen" to people
15   who testify against gang members.  She acknowledged sometimes people who
     testify and their families get threatened with physical violence and she did not
16   want anyone "messing with" her family.  At first, she denied being afraid to
     testify.  She also denied her worries affected her testimony.  She said she simply
17   could not remember many of the details of the incident.  She later admitted she
     was "a little bit" scared of being at trial.  In addition, she admitted that, after the
18   incident, she and her mom decided it would be best if she left the state and stayed
     with relatives.  She also admitted she did not want to return to the state to testify.
19   She only returned because she was told if she did not obey the witness subpoena,
     she would be brought back to the state in custody to testify.  [¶]  Before Davis left
20   the state, and after she had talked with a police detective about the shooting,
     someone slashed the tires and set a fire on the windshield of her mother's car.  She
21   factored this vandalism into her decision to leave the state.

22        The trial court allowed the testimony about the vandalism to Davis's
     mother's car subject to a limited purpose instruction.  The instruction informed the
23   jury the vandalism evidence was "admitted for a limited purpose of how this
     evidence may affect the state of mind of (Davis) when she testified in court.  You
24   may consider that evidence only for the limited purpose and for no other purpose.
     As no evidence has been provided linking (Grady), to these incidents, you are not
25   to consider this evidence as related to (Grady)."

26        Grady contends the trial court erred in admitting the vandalism evidence
     because Grady was not linked to the vandalism and there was no evidence Davis's
27   equivocal testimony was based upon fear of retaliation rather than an honest lack
     of memory.  We conclude this contention lacks merit.

28

"'Evidence that a witness is afraid to testify or fears retaliation for testifying is relevant to the credibility of that witness and is therefore admissible. (Citations.)  An explanation of the basis for the witness's fear is likewise relevant to (his or) her credibility and is well within the discretion of the trial court. (Citations.)' (Citations.)  '(T)here is no requirement to show threats against the witness were made by the defendant personally or the witness's fear of retaliation is "directly linked" to the defendant.'"  (*People v. McKinnon* (2011) 52 Cal.4th 610, 668.)

Moreover, in this case, there is no dispute Davis was a reluctant and uncooperative witness.  She left the state after the shooting and returned to appear for trial only upon threat of being taken into custody as a material witness.  At trial, as the People painstakingly describe in their brief, her testimony was marked by hesitancy, equivocation, inconsistency, and incredible memory loss. For Grady to suggest on appeal the prosecutor did not have a sufficient basis to inquire into whether and why she was afraid to testifying [sic] borders on the absurd.

Further, even if the trial court had erred in allowing the vandalism evidence, the error was harmless.  The trial court specifically instructed the jury it could only consider the vandalism evidence in evaluating Davis's state of mind when she testified and could not consider it against Grady.  Grady's counsel did not object to or seek modification of this instruction.  In addition, "(w)e 'credit jurors with intelligence and common sense' (citation) and presume they generally understand and follow instructions."  (*People v. McKinnon, supra*, 52 Cal.4th at p. 670.)  We, therefore, conclude it is not reasonably probable the verdict would have been more favorable to Grady absent the claimed error.  (*People v. Watson, supra*, 46 Cal.2d at p. 836.)

(Lodgment No. 6, People v. Grady, No. D057450, slip op. at 24-27.)

Clearly established federal law provides that in order to establish a due process violation arising from the introduction of Davis' testimony, Petitioner must show that the trial court's ruling was so prejudicial that it rendered his trial fundamentally unfair.  McGuire, 502 U.S. at 70; Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919.  The state court correctly found that the evidence was relevant to Davis' state of mind.  As outlined above, Davis testified at first that she was not scared to testify, and then almost immediately indicated that she was a little scared, and said she was scared when she spoke to the police.  (RT 911-12.)  She also said that the damage to her mother's car was a factor in her decision to leave the state, and that she did not voluntarily come back to testify.  (RT 913-14.)  She said "things happen" to people in her neighborhood who testify against gang members, and she did not "want people messing with my family."  (RT 910.)  The gang expert testified that people who live in Davis' neighborhood and cooperate with the police or testify in court against gang members are considered "snitches," who are subject to gang retaliation, including threats, violence and shootings.  (RT 1800-04.)

Thus, although Petitioner argues that there was no evidence he personally caused Davis to be frightened or concerned, there was evidence that Petitioner was an active member of the Neighborhood Crips, that there could be violent consequences for testifying against gang members, that Davis was aware of that, and that it made her scared during her testimony and her police statement.  Her state of mind in this regard was clearly at issue in the trial, because, as the state court pointed out, "her testimony was marked by hesitancy, equivocation, inconsistency, and incredible memory loss."  (Lodgment No. 6, People v. Grady, No. D057450, slip op. at 26.)

To the extent Petitioner argues that Davis' identification of her boyfriend, her boyfriend's brother, and another member of their gang can be seen as an indication she was specifically afraid of testifying against Petitioner, the same conclusion could be drawn from the evidence that Petitioner was a gang member and people who testify against gang members are subject to retaliation.  Nevertheless, the jury was instructed only to consider Davis' testimony regarding her fear of testifying for her state of mind, and was informed that there was no evidence linking Petitioner to the incidents with her mother's car.  The Court must presume the jurors followed their instructions.  Franklin, 471 U.S. at 324 n.9.  That presumption may be overcome where there is "a strong likelihood that the effect of the evidence would be devastating to the defendant."  Greer v. Miller, 483 U.S. 756, 766 n.8 (1987).  Petitioner argues that it was an inflammatory line of questioning because it invited the jury to suppose Petitioner had been involved in the acts of vandalism, or to suppose that Davis was afraid specifically of Petitioner.  However, because the jury heard evidence from the gang expert and Davis herself that testifying against gangs is dangerous, was shown a video of the shooting, and received DNA evidence connecting Petitioner to the shooting, along with Bidales' eyewitness identification associating Petitioner with the murder weapon and one of the shooters, evidence that Davis feared testifying and evidence that her mother's car had been vandalized after she told the police that Martrell and Allen were involved in the shooting, was not devastating to Petitioner's defense.

Petitioner also alleges in his Traverse that his trial counsel rendered constitutionally ineffective assistance when he answered, "Yes, your Honor," when the trial judge asked, "Does that work for you," after ruling that he would give a limiting instruction and allow Davis'

testimony regarding the incident with her mother's car. (Traverse at 12.) This is a new claim which is not presented in the Petition, and the Court has the discretion to consider it or refuse to consider it because Petitioner was specifically warned in this Court's February 28, 2014, Order directing a response to the Petition [ECF No. 10 at p. 4] that his Traverse "shall not raise new grounds for relief that were not asserted in the Petition." See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (stating that court may ignore issue raised for first time in traverse when scope of traverse has been specifically limited by court order and petitioner ignores order to file a separate pleading indicating intent to raise claim); but see Boardman v. Estelle, 957 F.2d 1523, 1525 (9th Cir. 1992) (holding that district court erred in failing to address issue raised in traverse). The Court will exercise its discretion to consider this claim, and will discuss it immediately below in connection to the other claims of ineffective assistance of counsel presented in Claim 6. See e.g. Kimmelman v. Morrison, 477 U.S. 365, 386 (1986) ("It will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance.") The Court will likewise address at the end of this Report Petitioner's Traverse claim that the accumulation of the alleged trial errors in his case violated his federal constitutional rights.

An evidentiary hearing is neither necessary nor warranted with respect to Claim 5 because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief. Campbell, 18 F.3d at 679; Pinholster, 131 S.Ct. at 1398, 1401 n.10; Stokley, 659 F.3d at 808-09. Accordingly, the Court finds that the state court adjudication of Claim 5 was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts. The Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 5.

## G.  Claim 6

Petitioner alleges in Claim 6 that he was denied his Sixth Amendment right to the effective assistance of counsel by his trial counsel's failure to call alibi witnesses, and by his appellate counsel's failure to raise an issue regarding the prejudicial effect of the introduction

of rap lyrics. (Pet. at 6, 94.) Respondent answers that the state appellate court's denial of these claims, on the basis that the alibi witnesses could not testify as to Petitioner's whereabouts during the crimes and Petitioner had failed to indicate on what basis the introduction of the rap lyrics could have been challenged, is neither contrary to nor involves an unreasonable application of clearly established federal law. (Ans. Mem. at 55-60.) Petitioner replies that the failure to call the alibi witnesses denied him the opportunity to present a complete defense, and that his trial counsel failed to provide him with statements from the alibi witnesses or indicate whether they would have been willing to testify. (Traverse at 14-15.)

Petitioner presented this claim to the state superior and supreme courts in sequential habeas petitions. (Lodgment Nos. 9, 11.) The Court will look through the silent denial by the state supreme court and apply 28 U.S.C. § 2254(d) to the superior court order.

**a. Trial Counsel**

With respect to allegations that trial counsel provided constitutionally ineffective assistance by failing to call alibi witnesses, the state superior court stated:

> According to trial counsel's own statement, he did interview petitioner's alibi witnesses, but they could not vouch for petitioner's whereabouts around the time when the crime took place. Petitioner has failed to produce declarations by these witnesses providing petitioner with a solid alibi or proof that his trial attorney failed to interview them.
>
> The petitioner bears the burden of proving the facts upon which he basis his claim for relief. (*In re Riddle* (1962) 57 Cal.2d 848, 852.) The petition should include copies of reasonably available documentary evidence in support of claims, including pertinent portions of hearing transcripts and affidavits or declarations. (*People v. Duvall, supra,* 9 Cal.4th at 474.) Under the circumstances, petitioner has failed to show that the failure to call these witnesses at trial fell below an objective standard of reasonableness or that he was prejudiced thereby.

(Lodgment No. 10, In re Grady, No. HC 21339, Order at 4 (Cal.Sup.Ct. Sept. 17, 2013).)

It appears that the superior court did not adjudicate this claim on the merits, but denied it on the procedural ground that it was not supported with affidavits from the alibi witnesses. See Pombrio v. Hense, 631 F.Supp.2d 1247, 1251-52 (C.D. Cal. 2009) (explaining that a citation to Duvall points to correctable defects and therefore renders such claims unexhausted in federal court). Petitioner did not correct that defect when he presented the claim to the state supreme court, and, although Respondent has waived the exhaustion requirement (see Ans. at 2), the

claim arguably was not adjudicated on the merits in state court.  The Court need not make that determination, however, because it is clear that this claim fails even under a de novo review.

Assuming the state court denied the claim based on Petitioner's failure to provide declaration or affidavits from his alibi witnesses, it has been over a year since he filed his state superior court habeas petition, and because he no longer has state court remedies available with respect to this claim, it is technically exhausted and procedurally defaulted in this Court.  See Cassett v. Stewart, 406 F.3d 614, 621 n.5 (9th Cir. 2005) ("A habeas petitioner who has defaulted his federal claims in state court meets the *technical* requirements for exhaustion; there are no state remedies any longer 'available' to him."); Coleman v. Thompson, 501 U.S. 722, 735 n.1 (1991) (holding that a procedural default arises when "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred."); see id. at 729-30 (a procedural default arises from a violation of a state procedural rule which is independent of federal law, and which is clearly established and consistently applied.); see Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003) ("We conclude that because the California untimeliness rule is not interwoven with federal law, it is an independent state procedural ground."); see also Walker v. Martin, 562 U.S. ___, 131 S.Ct. 1120, 1125-31 (2011) (holding that California's timeliness requirement providing that a prisoner must seek habeas relief without "substantial delay" as "measured from the time the petitioner or counsel knew, or should reasonably have known, of the information offered in support of the claim and the legal basis for the claim," is clearly established and consistently applied).  The standard of review applicable to claims which are technically exhausted and procedurally defaulted is not clear.  Slovik v. Yates, 556 F.3d 747, 751 n.4 (9th Cir. 2009).  The Court need not reach that issue because, for the following reasons, this claim fails to present a basis to grant federal habeas relief even under a de novo review.[4]

---

[4] As discussed immediately below in Claim 7, this Court may reach the merits of a procedurally defaulted claim if the petitioner can demonstrate cause for the failure to timely present the claim to the state courts and prejudice arising from the default, or demonstrate that a fundamental miscarriage of justice would result from the Court not reaching the merits of the defaulted claim.  Coleman, 501 U.S. at 750.  The Court need not make a determination whether Claim 6 is procedurally defaulted, whether Petitioner could make a showing sufficient to excuse the default, or the proper standard of review for

Clearly established federal law provides that for ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things.  First, he must show that counsel's performance was deficient.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  Second, he must show counsel's deficient performance prejudiced the defense, which requires showing that "counsel's errors were so serious as to deprive [Petitioner] of a fair trial, a trial whose result is reliable."  Id.  To show prejudice, Petitioner need only demonstrate a reasonable probability that the result of the proceeding would have been different absent the error.  Id. at 694.  A reasonable probability in this context is "a probability sufficient to undermine confidence in the outcome."  Id.  Petitioner must establish both deficient performance and prejudice in order to establish constitutionally ineffective assistance of counsel.  Id. at 687.

"Surmounting Strickland's high bar is never an easy task."  Padilla v. Kentucky, 559 U.S. 356, 371 (2010).  "The standards created by Strickland and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so."  Richter, 131 S.Ct. at 788 (citations omitted).  The standards are "difficult to meet" and "demands that state court decisions be given the benefit of the doubt."  Pinholster, 131 S.Ct. at 1398.  Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not as a means of error correction.  Richter, 131 S.Ct. at 786, quoting Jackson, 443 U.S. at 332 n.5.

Petitioner has provided no basis, here or in the state court, to call into question trial counsel's decision not to call alibi witnesses who could testify as to Petitioner's whereabouts before and after but not during the shooting.  Such witnesses, as recognized by both the trial judge and defense counsel during the Marsden/Faretta motion hearings (RT 461-62, 2274), may have done more harm than good.  Petitioner has not, either here or in the state courts, challenged

_____

such a claim, because even under a de novo review it is clearly without merit.  The Ninth Circuit has indicated that: "Procedural bar issues are not infrequently more complex than the merits issues presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same."  Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997) ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only that it ordinarily should be.")

that finding, identified the witnesses or shown they were able to provide him with an alibi for the time of the shooting.  He has therefore failed to overcome the strong presumption that trial counsel's decision not to call those witnesses fell within the "wide latitude counsel must have in making tactical decisions."  Strickland, 466 U.S. at 689.  Petitioner has alleged neither deficient performance nor prejudice with respect to the alibi witnesses.  See Richter, 131 S.Ct. at 791 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686.  Accordingly, this claim does not present a basis for federal habeas relief even under a de novo review, and the Court recommends denial of habeas relief irrespective of whether it was adjudicated on the merits in the state court or procedurally defaulted in this Court.  Lambrix, 520 U.S. at 525; Franklin, 290 F.3d at 1232.  An evidentiary hearing is neither necessary nor warranted with respect to this claim because it can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for relief.  Campbell, 18 F.3d at 679; Stokley, 659 F.3d at 808-09.

Petitioner contends in his Traverse that his trial counsel should have objected to the introduction of Davis' testimony or to the limiting instruction.  (Traverse at 12.)  Because Petitioner has never presented this claim to any state court, and because it has been over a year since he filed his state superior court habeas petition containing his other claims of ineffective assistance of counsel, this claim is technically exhausted and procedurally defaulted for the same reasons discussed immediately above.  Walker, 131 S.Ct. at 1125-31; Coleman, 501 U.S. at 729-30, 735 n.1; Cassett, 406 F.3d at 621 n.5; Bennett, 322 F.3d at 581.

As discussed above in Claim 5, trial counsel objected to the introduction of Davis' testimony regarding her fear of retaliation and the vandalism to her mother's car, and it was admitted over his objection with a strong limiting instruction.  There is nothing in the record to suggest that had counsel objected to the instruction, or imposed any other objection to the introduction of the evidence, the evidence would have been excluded or the instruction modified. Petitioner has failed to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" in failing to

interpose any additional objection to the introduction of Davis' testimony or to the limiting instruction.  Neither has he shown a reasonable probability that the result of the proceeding would have been different absent that failure.  He has therefore failed to allege facts, which if true, amount to a federal constitutional violation.  <u>Strickland</u>, 466 U.S. at 694.  An evidentiary hearing is therefore neither necessary nor warranted.  <u>Campbell</u>, 18 F.3d at 679; <u>Stokley</u>, 659 F.3d at 808-09.  The Court finds that this claim fails under a de novo review, and recommends habeas relief be denied notwithstanding Petitioner's failure to present it to the state courts.  <u>Lambrix</u>, 520 U.S. at 525; <u>Franklin</u>, 290 F.3d at 1232.

### b. Appellate Counsel

In his habeas petitions filed in the state superior and supreme court, as here, Petitioner merely states that: "Petitioner contends that appellate counsel failed to pursue the issue of the prejudicial effect of the rap lyrics introduced at trial."  (Pet. at 94; Lodgment No. 9 at 3; Lodgment No. 11 at 3.)  The state superior court order stated:

> Likewise, petitioner fails to produce any evidence showing what rap lyrics were introduced at trial or how this evidence allegedly prejudiced him.  All petitioner provides is his conclusory allegation that he was prejudiced by these lyrics.  [¶] A habeas petition must support its claims with "the necessary allegations of fact" (*In re Sandel* (1966) 64 Cal.2d 412, 413, citing *In re Swain* (1949) 34 Cal.2d 300, 304.)  "Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing."  (*In re Marquez* (2007) 153 Cal.App.4th 1, 11, citing *People v. Duvall* (1955) 9 Cal.4th 464, 474.)  [¶]  Without this evidence and a more detailed explanation of the basis for his allegations, petitioner has failed to establish that either trial or appellate counsel's representation was unreasonable or prejudicial.  Therefore, he has failed to establish IAC.

(Lodgment No. 10, <u>In re Grady</u>, HC 21339, Order at 4-5.)

Because Petitioner's claim was denied on the basis that it was not supported with sufficient factual allegations or record citations, and because he did not correct that defect when he presented the claim to the state supreme court, it appears that this claim was not adjudicated on the merits in state court.  <u>Pombrio</u>, 631 F.Supp.2d at 1251-52.  The claim appears to be technically exhausted and procedurally defaulted for the same reasons set forth above.  The Court need not make that determination, however, and need not reach the issue of procedural default, because, for the following reasons, the claim fails even under a de novo review.

The Strickland standard applies to claims of ineffective assistance of appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000) (holding that the Strickland standard applies to ineffective assistance of appellate counsel claims); see also Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (holding that where "trial counsel's performance, although not error-free, did not fall below the Strickland standard," no prejudice arose from appellate counsel's failure to raise the issue on appeal); Baumann v. United States, 692 F.2d 565, 572 (9th Cir. 1982) (stating that an attorney's failure to raise a meritless legal argument does not constitute ineffective assistance).

During the testimony of the prosecution's gang expert, evidence was presented, in the context of proving that Petitioner was a member of the Neighborhood Crips, that during a search of his bedroom one month after the shooting, a resume with his name was found in a box along with a composition notebook. (RT 1057-58.) The officer who seized the notebook testified that it contained violent rap lyrics which mentioned shootings and the Crips. (RT 1058.) Defense counsel brought a motion to exclude the notebook, and to preclude the gang expert from opining on its contents, on the basis that it would be cumulative to substantial gang evidence the prosecution intended to present, and that it would be highly inflammatory because the only purpose of its introduction would be to show Petitioner had a criminal disposition. (CT 70; RT 815-22.) The trial judge denied the motion, finding the notebook to be highly probative and relevant, as it contained lyrics indicating intent to kill and being "down with the gang," although the judge indicated that he would consider a limiting instruction if necessary. (RT 821-23.) The gang expert testified that, based on his training and experience as a gang detective:

A.   To me it shows that [Petitioner] understands - number one, he has an understanding of what it is to be a gang member. And sometimes through - at least in a lot of these he's talking about how, you know - different ways of putting in work and, you know, talking about guns a lot and the things that are important to gang members.

Q.   And did any of these raps or any of these notes in this notebook catch your attention, specifically?

A.   Yeah. One of them he talks specifically about a murder that occurred to his friend. August 6, 2006, Michael Daniels was murdered at 47th Street and Guymon. Apparently he's a close friend, because he wrote a whole rap basically talking about Lil' Smash. And that was his name; Michael Daniels.

1   Q.   And who was Michael Daniels?

2   A.   He's a Neighborhood Crip that went by Smash LOC or Lil' Smash.

3   Q.   He was killed by other rival gang members?

4   A.   Yes, he was.

5   Q.   What gang?

6   A.   Lincoln Park.

7   Q.   And any other raps or lyrics in this notebook that caught your attention for Mr. Grady?

8

9   A.   There are a few of them that caught my attention.

    Q.   And do you have some of those in front of you?; copies of them?
10
    A.   I have copies of them.  Yes.  Somewhere here.  Here they are.
11
    Q.   If you could note, we'll go through them one by one.
12
    A.   Okay.
13
    Q.   I know there's some, but not too many.  Which ones you noted and, specifically,
14       why they were important to you.

15  A.   Well, like I said, most of them have something in it that caught my attention.  Do
         you want me to just take certain parts out of them?
16
    Q.   Sure.  Whatever  you feel most comfortable doing.
17
    A.   He's talking - the first one, it looks like it's titled, "Traffic."  But on part of it he's
18       talking about he felt for his dead homie's memories, which is a lot of times what
         motivates a lot of these guys to keep the violence going, to retaliate.  Talks about
19       being in the streets, chasing enemies; another thing that's kind of specific to gang
         members.  He talks a lot about locin'.  And locin' can be a lot of things, but it's
20       representing Crips.  Locs, when they - they will address each other as locs
         sometimes or cuz.  But if you're loc, then you're just representing Crips being
21       real.

22       Here it says - I'll start at line, like, three on page 39.  It says, "target any nigga
         who says they my enemy.  Brain bubbling like hot - brain bubbling hot like fish
23       grease.  Mad gorilla beating my chest, yelling SDC."  Talks about shooting
         somebody and then banging your chest like you're the victor and yelling SDC,
24       San Diego Crip.  That's significant.

25       The next one he's just talking about a pistol, but nothing real specific.  On the one,
         page 41, it says, "my semiautomatic weapon get to busting."  Just means shootin' -
26       going to go shootin' - shootin' the gun.  I try to pick out some of the ones that I -
         really caught my attention.
27
    Q.   Sure.
28

A.   All these do.  And this is specific to - pretty much to Crips on page 1644.  It says, "hoodstar make it cracc," or, "hoodster make it cracc."  And if you bang West C or West Coast, 4-0 and 3-0, "making it cracc" is usually shooting.  And he's talking about West Coast kind of their being allies; West Coast and Neighborhood.  Hoodster is what they call each other, too, if you're from Neighborhood.

Here's the one I was talking about with - on page 1646 he talks specifically about the date that Michael Daniels was shot and killed.  On page 1647 he's talking about, "when it's time to ride load up that nine" - or nine millimeter - "and let that shit go bang, bang."  So he's talking about loading up a gun and going and shooting.

On the - 1649, "so many bullets I pop.  So many victims see shot."  He's talking about the same thing.  It's talking about doing shootings.  This just shows - this one on 1650 is showing his allegiance to Crips.  "I'm going to ride for the hood."  Let's see.  "I'm going to die for the hood."  Just a few of the lines out of it.  "The hood" being Neighborhood.

And then, on 1651 he's talking specifically about different Neighborhood gang members.  Talking about, "Why T-Rex had to get caught with a burner," and then, "Why Lil' Aaron had to get hit with a nine."  Lil' Aaron would be Aaron Cooper, who was - I think it was August 12th of 2006, he was killed real close to the area where - where Michael Daniels was killed.  And then, "Why is Lil' Smash, Baby Ski, and Baby Trim ain't alive."  Lil' Smash would be Michael Daniels again; Baby Ski is Darron Griffin; and Baby Trim is Lofton, Guy Lofton.  And they were all Neighborhood Crips that had been killed.

Q.   By rival gang members?

A.   By rival gang members.  Yes.  Did you want me to keep going?

Q.   Unless you had anything more specific in those, that's fine.

A.   Yeah, I think that pretty much sums most of it up.

(RT 1822-25.)

Defense counsel then extensively cross-examined the gang expert regarding both the context and content of Petitioner's rap lyrics, and in doing so compared them to rap lyrics from mainstream artists in the "gangster rap" genre by pointing out that many such artists are listed in Petitioner's notebook, and that many of their published lyrics are similar to Petitioner's lyrics.  (RT 1870-82.)  A redacted copy of the notebook, along with copies of published mainstream gangster rap lyrics, were introduced into evidence and made available to the jury during its deliberations.  (RT 1921-23.)

Petitioner has failed to identify any claim his appellate counsel could have presented regarding the introduction of the gang lyrics.  Defense counsel vigorously attempted to have

-52-

13cv2479

them excluded and, when that failed, vigorously cross-examined the gang expert, pointing out that the lyrics were actually very mainstream and not necessarily specific to Petitioner and his gang.  The lyrics were relevant to Petitioner's membership in the Neighborhood Crips so as to support the gang enhancement allegation because they showed he possessed a motive to retaliate against the Lincoln Park Logan Bloods for having killed friends and fellow Crips.  Any connection the jury may have drawn between the lyrics and Petitioner's membership in a violent street gang would have been cumulative to the testimony of the gang expert that Petitioner was a documented member of the Neighborhood Crips, which he said is a criminal street gang which not only engages in violent retaliatory murders, but routinely engages in drive-by shootings, murders, attempted murders, drug dealing, robberies and carjackings. (RT 1796-1812.)  Thus, Petitioner has failed to demonstrate that the lyrics were not relevant to issues regarding the gang enhancement allegations or his intent in shooting the victims, and has failed to show they were not cumulative to other, stronger, properly admitted evidence.  He has not shown that their introduction was so prejudicial that it rendered his trial fundamentally unfair.  <u>Woodall</u>, 134 S.Ct. at 1705; <u>McGuire</u>, 502 U.S. at 70; <u>Ortiz-Sandoval</u>, 81 F.3d at 897; <u>Jammal</u>, 926 F.2d at 919.  Petitioner has therefore failed to allege facts which, if true, demonstrate constitutionally ineffective assistance of appellate counsel in failing to challenge the introduction of the rap lyrics.  <u>Robbins</u>, 528 U.S. at 285; <u>Featherstone</u>, 948 F.2d at 1507; <u>Baumann</u>, 692 F.2d at 572.

An evidentiary hearing is neither necessary nor warranted with respect to Claim 6 because the claim can be denied on the basis of the state court record, and Petitioner's allegations, even if true, do not provide a basis for habeas relief.  <u>Campbell</u>, 18 F.3d at 679; <u>Stokley</u>, 659 F.3d at 808-09.  Accordingly, the Court finds that the state court adjudication of the ineffective assistance of trial counsel aspect of Claim 6 regarding failure to call alibi witnesses was neither contrary to, nor involved an unreasonable application of, clearly established federal law, and was not based on an unreasonable determination of the facts.  The Court also finds that the ineffective assistance of appellate counsel aspect of Claim 6, and Petitioner's Traverse claim of ineffective assistance of trial counsel alleging a failure to adequately object to the introduction of Davis' testimony regarding her fear of testifying and vandalism to her mother's car, do not

1   provide for habeas relief even under a de novo standard of review. The Court **RECOMMENDS**

2   habeas relief be **DENIED** as to Claim 6.

3   **H.      Claim 7**

4           Petitioner alleges in Claim 7 that he was denied his Sixth Amendment rights to represent

5   himself and to the effective assistance of counsel by the denial of his <u>Faretta</u> and <u>Marsden</u>

6   motions.  (Pet. at 7, 95.)  Respondent answers that this claim is procedurally defaulted due to

7   Petitioner's failure to raise it on direct appeal. (Ans. Mem. at 63-66.)  Alternately, Respondent

8   contends that there was no error in denying the motions because Petitioner provided a rambling

9   and inarticulate colloquy during those motions which the trial court properly concluded provided

10  no basis to remove counsel and contained no unequivocal request to represent himself.  (<u>Id.</u> at

11  66-68.)  Petitioner replies that he unequivocally invoked his right to self-representation, and it

12  was unfair for the trial judge to deny the motion simply because Petitioner could not articulate

13  a reason why he wanted to represent himself.  (Traverse at 13-14.)

14          This claim was presented to the state superior and supreme courts in habeas petitions.

15  (Lodgment Nos. 9, 11.)  The Court will look through the silent denial by the state supreme court

16  to the last reasoned opinion, the superior court order, which stated:

17              Denial of a *Marsden* motion is reviewable on appeal from the judgment.
            (Pen. Code, § 1237 and see *People v. Cole* (2004) 33 Cal.4th 1158, 1190.) Denial
18          of a *Faretta* motion is also reviewable on appeal from the judgment.  (Pen. Code,
            § 1237 and see *Faretta, supra*, 422 U.S. at p. 811.)  Habeas corpus cannot serve
19          as a substitute for appeal.  (*In re Dixon* (1953) 41 Cal.2d 756, 759.)  Neither of
            these issues was raised on appeal.  An unjustified failure to present an issue on
20          appeal precludes consideration of the issue by way of a petition for writ of habeas
            corpus in the absence of special circumstances.  (*In re Dixon* (1953) 41 Cal.2d
21          756, 759; *In re Harris* (1993) 5 Cal.4th 813, 829.)  Petitioner fails to provide any
            justification warranting review by habeas corpus.

22

23  (Lodgment No. 10, <u>In re Grady</u>, No. HC 21339, Order at 5.)

24          When a state court rejects a federal claim based upon a violation of a state procedural rule

25  which is adequate to support the judgment and independent of federal law, a habeas petitioner

26  has procedurally defaulted his claim in federal court.  <u>Coleman</u>, 501 U.S. at 729-30.  A state

27  procedural rule is "independent" if it is not interwoven with federal law.  <u>LaCrosse v. Kernan</u>,

28  244 F.3d 702, 704 (9th Cir. 2001).  A state procedural rule is "adequate" if it is "clear,

1    consistently applied, and well-established" at the time of the default.  <u>Calderon v. United States</u>

2    <u>District Court</u>, 96 F.3d 1126, 1129 (9th Cir. 1996).

3         Respondent bears the initial burden of pleading as an affirmative defense that Petitioner's

4    failure to satisfy a state procedural bar forecloses federal habeas review.  <u>Bennett</u>, 322 F.3d at

5    586.  Respondent contends that the <u>Dixon</u> rule, requiring a claim such as this one to be raised

6    on direct appeal or not at all, is an adequate and independent state procedural rule.  (Ans. Mem.

7    at 50-51.)  Respondent admits that the Ninth Circuit has yet to determine whether the <u>Dixon</u> rule

8    is independent and adequate, but invites the Court to do so by comparing it to California's

9    timeliness rule, which has been determined to be independent and adequate, a comparison which

10   Respondent points out has been drawn by the Chief Judge of the Ninth Circuit and by a Judge

11   in this District.  (<u>Id.</u>, citing <u>Smith v. Crones</u>, 2010 WL 1660240 (E.D. Cal. 2010) (Kozinski, C.J.,

12   unpublished order denying habeas petition), citing <u>Protsman v. Pliler</u>, 318 F.Supp.2d 1004,

13   1007-08 (S.D. Cal. 2004) (finding <u>Dixon</u> rule to be an adequate and independent state procedural

14   rule).)

15        Because Respondent has carried the initial burden of pleading the existence of an

16   adequate and independent state procedural bar, the burden has shifted to Petitioner to challenge

17   the independence or adequacy of that procedural bar.  <u>Bennett</u>, 322 F.3d at 586.  Petitioner

18   makes no such effort, and the Court finds Claim 7 to be procedurally defaulted.  <u>Id.</u>  The Court

19   may reach the merits of the claim if Petitioner can demonstrate cause for his failure to satisfy the

20   state procedural rule and prejudice arising from the default, or if he can demonstrate that a

21   fundamental miscarriage of justice would result from the Court not reaching the merits of the

22   defaulted claim.  <u>Coleman</u>, 501 U.S. at 750.

23        **1. Cause**

24        The cause prong can be satisfied if Petitioner demonstrates some "objective factor" that

25   precluded him from raising his claims in state court, such as interference by state officials or

26   constitutionally ineffective counsel.  <u>McCleskey</u>, 499 U.S. at 493-94.  The only reason apparent

27   in the record for the failure to present this claim on direct appeal is a strategic choice by

28   appellate counsel.  <u>See</u> <u>Miller v. Keeney</u>, 882 F.2d 1428, 1434 (9th Cir. 1989) (holding that

appellate counsel has no constitutional obligation to raise every nonfrivolous issue on appeal because "[i]n many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.")  As discussed immediately below in the prejudice section, Petitioner is unable to establish that a challenge to the denial of his Marsden and Faretta motions would have succeeded on appeal.  Thus, he is unable to rely on appellate counsel's decision not to raise the claim on appeal to establish cause.  See Edwards v. Carpenter, 529 U.S. 446, 451-52 (2000) ("Although we have not identified with precision exactly what constitutes "cause" to excuse a procedural default, we have acknowledged that in certain circumstances counsel's ineffectiveness in failing properly to preserve the claim for review in state court will suffice.  Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution.") (citation omitted).  The Court finds that Petitioner has not shown cause to excuse the default.  McCleskey, 499 U.S. at 493-94; Edwards, 529 U.S. at 451-52; Keeney, 882 F.2d at 1434.  Even assuming Petitioner could establish cause, he must demonstrate both cause and prejudice, and, for the following reasons, he is unable to demonstrate prejudice.

**2. Prejudice**

"Prejudice [to excuse a procedural default] is actual harm resulting from the alleged error."  Vickers v. Stewart, 144 F.3d 613, 617 (9th Cir. 1998).  Petitioner cannot demonstrate prejudice arising from the failure of this Court to reach the merits of Claim 7 sufficient to excuse the default because, for the following reasons, he cannot establish that a successful challenge to the denial of his Marsden and Faretta motions was available on direct appeal.

The following exchange took place between the trial judge ("TJ"), Petitioner ("Pet") and defense counsel ("DC") during the first Marsden motion, which was held two days before the start of trial:

TJ:     How can I help you Mr. Grady?

Pet:    I need a new lawyer.

TJ:     And why do you need a new lawyer?

| | | |
|---|---|---|
| 1 | Pet: | I would say just due to counseling, man, everything ain't right. Me and Mr. John here, we really can't get along like that, man. You know what I mean. We can't talk without arguing and stuff. And I feel that I'm facing a very serious situation here, and I fear my life is on the line. I want somebody I feel I can trust, that can represent me in the proper manner. |
| 4 | TJ: | Well, specifically, I'm not – you're saying that you can't get along without arguing, and he's not representing you in the proper manner. So why don't you tell me about what you're disagreeing on and also why you don't think he's properly representing you. Because I don't know. Did you read the in limine motions that he filed? |
| 7 | Pet: | I don't ever get to read nothing. I don't get to see nothing. I don't get to read nothing. |
| 8 | TJ: | Well, I can tell you they were outstanding. Both lawyers. I thought [counsel for co-defendant Martrell Johnson]'s were, too. And I don't say that very often. But both lawyers are being very professional about that. And, quite frankly – and let me tell you this, too. Of the four lawyers that he had, four defense attorneys in the prior motions, your lawyer's motions were head and shoulders above the rest. Significantly better. All right. So – again, we're sitting in a different perspective. [¶] But why don't you tell me – we'll start with that one first – why he is not competently representing you. |
| 13 | Pet: | From my point of view, I feel like I'm still in a bind because I don't really know nothing. We talk or whatever, but it's like I ain't getting nothing out of it. I'm not understanding nothing, you know what I'm saying. |
| 15 | TJ: | What's the issue? |
| 16 | Pet: | It's not working. |
| 17 | TJ: | You're not helping me. |
| 18 | Pet: | I really can't explain myself thoroughly with this legal matter stuff, you know. I just feel I need another – I need a new lawyer man. |
| 19 | TJ: | Well, I'm giving you an opportunity to now tell me your complaint. And now you're telling me you can't articulate your complaint. You see the problem? |
| 21 | Pet: | Yeah. |
| 22 | TJ: | And if you need to take a minute, think about it. If you need to write it down, write it down. But I need you to explain yourself. Explain your complaint. Because this is a very serious matter, and you have to explain to me why you think he's not providing adequate representation. And, I mean, the fact that you disagree with him, that happens in every trial. So he's the captain of the ship, but why don't you tell me – |
| 25 | Pet: | Just disagreeing. Just, basically, I feel not getting along, you know what I mean. How you have somebody represent you which you can't even get along with the person. |
| 27 | TJ: | Why aren't you getting along with him? |

1  Pet:   I don't know.  I don't know.  We don't click, I guess.  I don't know.

2  TJ:    This is not a dating situation.  The fact you don't click –

3  Pet:   Exactly.

4  TJ:    -- doesn't matter.

5  Pet:   But if a person don't get along with a person – you can't get along with a person, how you going to have some person you don't get along with represent you.  If I
6         don't like you, or you don't like me, we don't get along, I can do whatever – why would I want to help you?  We don't get along.

7
   TJ:    Is it about – what are you not getting along about?  You're not telling me.  Are
8         you not getting along because you don't like the legal advice he's giving you? You don't like that way he's conducting himself in court?  Explain –

9
   Pet:   That's it right there.  Both of them.
10
   TJ:    Okay.  What has he done in court that you don't like?
11
   Pet:   Everything, I guess.  He don't do nothing to me.  I don't see nothing.  That's how
12         I feel.

13  TJ:    Again – all right.  And what have you been arguing about?

14  Pet:   I've been arguing about me getting a new lawyer.

15  TJ:    Well, there has to be a legal basis for it, and right now you're not providing any.

16  Pet:   I don't see what providing – like I say, I'm basically saying I'm not comfortable with the lawyer I was provided with, man.

17
   TJ:    Well, because – you know, this is not the first time other people have brought that
18         out.  And the, quote, unquote, not getting along, according to the California Supreme Court, in the underline Jones case, says that's not good enough.  Okay.  So you got
19         to do better.

20  Pet:   Well, I put a underline Lopez motion, then and I go pro per then, saying I represent myself if that's the case.  I probably do that.

21
   TJ:    Well, that is a different situation.  You know – well, again, before we get to the
22         underline Lopez – because that's a whole different issue.  And I'm trying to help – I'm trying to get to understand.  Again, not getting along, and you haven't articulated
23         why you're not getting along.  Are you disagreeing on your tactics for your defense?

24
   Pet:   I don't know no defense.  I'm in the blind.  I don't know no defense, I don't know
25         what the defense is.  I don't know nothing.  I'm just sitting here.  I come to court every day.  I come to court when I come to court, and I'm sitting here.  I don't
26         really hear nothing about my mind.  I'm in the blind.  I don't know nothing.  I don't know nothing.  I don't know no defense.  I don't know nothing.

27
   TJ:    You're just giving me conclusions.  And the Supreme Court has addressed this
28         issue, too.  And basically saying, simple solutions – simple conclusions that my

-58-

13cv2479

|   |   |   |
|---|---|---|
| 1 |   | lawyer's not doing his job; he doesn't have my best interest at hand, in the <u>Sylvia</u> case has been found insufficient to change the lawyers. I'm just telling you what the Supreme Court is saying, and they're the boss. So you got to do better. |
| 2 |   |   |
| 3 | Pet: | I ain't worried about it. I represent myself, you know what I mean. I rather do that. |
| 4 |   |   |
| 5 | TJ: | We're not talking about that yet. We'll talk about that in a few minutes. But let's – we're making a record of this. |
| 6 | Pet: | Okay. |
| 7 | TJ: | There's a question on timeliness, but we haven't started jury selection yet, so I don't think that really is our issue. But just why – there's two issues that I'm looking at. Let me help you with this. |
| 8 |   |   |
| 9 |   | Tell me why he's inadequate, and show me why you're embroiled in some type of conflict where you don't think he can adequately represent your interest. So those two things. All right. Tell me why he is not a good lawyer. Tell me why you are – I use the "embroiled." Let me use the word not getting along to the point where he can't adequately represent you. So those are the two things we're focused on. You tell me. |
| 10 |   |   |
| 11 |   |   |
| 12 |   |   |
| 13 | Pet: | I don't know, man. I can't – I can't explain that, man. I really – I feel that – I basically said all I can really say, how I feeling about the situation. Whatever you talking about, I don't understand, man. I don't understand. If that's the case – if the Supreme Court says what they say, I'm just going to represent myself, man. That's it. I mean, I'm not really tripping. |
| 14 |   |   |
| 15 |   |   |
| 16 | TJ: | Well, again, you have to – there's a problem with that, which I'll explain in a few minutes – is you have to make an unequivocal assertion of the right to represent yourself. And I don't think at this point we're – you've done that, because you say, I won't – because of this, then I don't want him. That's not unequivocal. But let me hear from your counsel. |
| 17 |   |   |
| 18 |   |   |
| 19 | Pet: | I feel that I can stand up for myself, you know what I'm saying. I can look into my own stuff and represent myself, do what I feel – what I want to do and now I want to represent myself and people who I want to come in court and all that. I want to run it myself. I don't want nobody running it for me. I want to run everything how I want to run it and how I feel I should run it based on my behalf; not based on nobody else's behalf or how this person feeling because this person said this or this person hired for this. That don't matter. I'm worried about myself, you know what I mean. They're not worried about me. Nobody else worried about me than me. So I represent myself then, that's how I feel about the situation. I think I can get the rest out of myself, because I believe the system and everything is not fair. And I think it's not run right, you know what I mean. And I feel that I'm being pressured in a lot of ceratin ways, you know what I mean, with this whole little case. I just feel, basically, everything is not right. So I rather just get time alone, sit myself, get all the paperwork directly to me. |
| 20 |   |   |
| 21 |   |   |
| 22 |   |   |
| 23 |   |   |
| 24 |   |   |
| 25 |   |   |
| 26 | TJ: | Just so we're clear, if – and we're not there yet. We're still in the <u>Marsden</u> hearing. But let me jump ahead for just a moment. [¶] If I was to allow you to represent yourself, you'd be picking a jury on Thursday. You know that. I'm not going to give you any more time. |
| 27 |   |   |
| 28 |   |   |

-59-

13cv2479

1   Pet:   Well, you got to give me time, because then I got to look over my case. You can't
2          just say – I got to get time to see what's going on, you know what I'm saying,
           because now I don't know – I don't know nothing, man. I'm just siting here, you
           know what I mean. And this is my case, my life, man. This is my life right here,
3          man. I'm facing life. This is my life. And I need to really know – I don't need
           to sit here and hear all these words and this and this that's going on and not know
4          what's going on. This guy, we're not communicating. We get to arguing. We
           talk, and we argue. Raise your voice. Why are we raising voices for? Why you
5          doing all that for? There's no reason for all that. I'm just trying to understand.
           I'm just trying to get a better understanding of this and get through this the best
6          way I can.

7   TJ:    Counsel, to the two factors I care about. Your adequate representation. I think,
           from what I've seen, you're doing everything I would expect a lawyer to do. But
8          I'll let you comment on that.

9   DC:    I can just tell your Honor that I think I'm prepared to go to trial. I think I'm
           adequately prepared to go to trial. We've had my investigators working on this
10         case. I think we've adequately investigated what I needed to investigate. I've
           filed the motions we need to file. I'm ready to go, prepared to go to trial at this
11         point.

12  TJ:    And this case I've had for a few months now. And I can state that your
           representation to this point has been outstanding. You have filed the appropriate
13         in limine motions. You're doing everything that a professional of your caliber –
           we would expect of somebody who represents a defendant accused of these
14         serious type of charges. So that prong of adequate representation, you're fine.
           You're providing, you're doing what I would deem to be an excellent job. [¶] So
15         let's talk about the embroilment and whether or not there's something so it's
           irreconcilable, where you could not effectively represent him.
16
    DC:    Your Honor, this is actually the first time I've heard this from Mr. Grady. There's
17         nothing on my part that would say that there's been any difficulty with Mr. Grady.
           I've, actually, always gotten along with him.
18
    TJ:    Is this the first time that you've argued with him?
19
    DC:    I can't say that we haven't – argument's kind of hard to say. We've disagreed
20         about stuff. I've explained things to him. I don't think we've really argued, but
           he'll say, what about this, this, this? And I'll turn around and say, well, this is the
21         problem with that, the situation with that, and this is what could happen to you if
           this happened. So I would never initially say it was exactly what was going to
22         happen. But that's probably the strongest we'd get. We never disagreed about
           tactics, for example.
23
    TJ:    That's my next question, is, is it regarding how he wants his defense put on?
24
    DC:    No. I mean, actually, honestly, we've had lots of discussion about the case, about
25         what I think his strengths and weaknesses are in the case. And we've – I can – the
           only thing I can say is there's been a little disagreement about the witnesses. We
26         found a partial alibi. And that's the problem, only partial. So I think it would be
           worse if we put those witnesses on. He may disagree with me on that, but that's
27         about the only thing we've ever discussed about – but nothing to the point where
           we've been to the point where we've been really upset with each other.
28

TJ:   You understand that your lawyer is kind of what we call the captain of the ship? And strategic – strategically, he's got to look at – and, quite frankly, based on his experience, weigh the impact of a, quote, partial alibi. Because what will happen is the DA will argue that, for example, they brought in a witness that said he was here at 10:00, but the shooting took place at 11:00. And we have nobody for 11:00. I'm just making up facts. Do you see the problem with that? Is then all of a sudden it makes it look worse that it is. I'm just telling you. [¶] So, other than that, you've gotten along with him? Other than the partial alibi issue?

DC:   Just so you know, for example, he's always wanted to waive his speedy trial rights. I've always tried – we're pushing forward. I think that's why we're going first.

TJ:   Right.

DC:   I think that's an advantage to that point. When it comes to offers and deals, he's always been the one that decided what he wants to offer. And in those situations, I don't think I've ever pressured him into anything.

TJ:   Okay. Anything else, sir, before I make a ruling on the <u>Marsden</u>? Mr. Grady.

Pet:   I don't know, man. I just don't – I don't understand what's going on, man. Y'all talking this, that, I don't – captain of the ship and all this. That don't concern me, man. This is my life, you know what I mean. I should be able to say what I want concerning my life and who will represent me. This is my life. Nobody else's life, man. Nobody else going to do no time. They got to do the time. Captain of the ship, that don't mean nothing to me. This is my life. This is not the captain of the ship life.

TJ:   There's ceratin decisions you can make. For example, you have the final decision about whether you testify or don't testify. But tactics or how you're trying the case and what defense to put on is generally left to him. And you, obviously, still can talk to him about that.

      The question here is, you know – let's take it, first of all, whether or not it's a timely motion. We haven't picked a jury yet. So I think that it's not – for me, the timeliness of the motion is not dispositive. But I look at the other prong, which is whether or not there's any truth to the defendant's complaints of his attorney's representation. And they're not true. His attorney is more than competently representing him.

      And the second thing is whether or not there's a conflict so great that there would be – there's no communication that would prevent an adequate defense or lead to ineffective representation of counsel. That's not here either. Based on counsel's statements to the court this morning. So the only thing I can conclude is that you just kind of want to delay. You're the guy that's been pushing this to go to trial from the get-go, and all of a sudden –

Pet:   Yeah. But that's a year ago I been pushing it. It's been a whole year. What happened to the 60 days?

TJ:   So they are not embroiled in any irreconcilable conflict.

Pet:   Been here a long time.

| | | |
|---|---|---|
| 1 | TJ: | So based on that, the <u>Marsden</u> is denied. [¶] All right. Well, we're here, so let's deal with – you said something about <u>Faretta/Lopez</u>, about representing yourself, Huh? Is that right? |
| 2 | | |
| 3 | Pet: | Yes, I did. |
| 4 | TJ: | Do you know anything about that? |
| 5 | Pet: | I don't know nothing, man. It don't seem to matter, man. The whole point is I just want another lawyer. System's not going to give me another lawyer, so it don't matter no more. Don't matter, man. |
| 6 | | |
| 7 | TJ: | I'm sorry. You said the system's not going to give you another lawyer, so it doesn't matter anymore? |
| 8 | | |
| | Pet: | No. |
| 9 | | |
| | TJ: | Well – so that's the reason you want to represent yourself, is that you're not happy with my decision on the <u>Marsden</u>; is that correct? |
| 10 | | |
| 11 | Pet: | That's not correct. But I don't know, man. I don't know nothing right now. |
| 12 | TJ: | Well, the request has to be unequivocal, and yours is far from equivocal. You basically are conditioning it. And, so, I don't – at this point it's not appropriate for me to let you represent yourself. That's what I look at. Is the request unequivocal. |
| 13 | | |
| 14 | | |
| | Pet: | I don't know what that really means, man. |
| 15 | | |
| | TJ: | You don't know what that means, but you still want to represent yourself? Do you think that's a good thing? |
| 16 | | |
| 17 | Pet: | It doesn't really matter, man. |
| 18 | TJ: | Well – and also, for the record, I am looking at the entire context of why – of this case and the underwriting [sic] reasons for the defendant – why he's doing this. And, you know, obviously he's not happy with the court's decision on the <u>Marsden</u>. But – and, also, for the record, for timeliness. If he had made an unequivocal request, if it was the proper thing, I think, even the day before jury selection probably it would be timely. So that's not the factor that I'm looking at. It's – it's the fact that he's simply – he's not making an unequivocal request. So at this point I'm just going to deny it. [¶] All right. Anything else? Mr. Grady? All right. |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | (RT 453-65.) | |

It is well established that the Sixth Amendment requires an appropriate inquiry into the

grounds for a <u>Marsden</u> motion. <u>Schell v. Witek</u>, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc);

<u>Hudson v. Rushen</u>, 686 F.2d 826, 829 (9th Cir. 1982) ("The trial court must take the time to

conduct such necessary inquiry as might ease the defendant's dissatisfaction, distrust, and

concern.") However, "The [Sixth] 'Amendment guarantees defendants in criminal cases the

right to adequate representation, but those who do not have the means to hire their own lawyers have no cognizable complaint so long as they are adequately represented by attorneys appointed by the courts.'" Schell, 218 F.3d at 1025-26, quoting Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 624 (1989).

As quoted at length above, the trial judge conducted a patient and thorough inquiry into Petitioner's reason for wanting new counsel. Despite being provided with several opportunities to do so, Petitioner was unable to identify any basis for substitution of counsel, other than that they did not get along, which, without more, is not sufficient. See People v. Jones, 29 Cal.4th 1229, 1246 (2003) ("If a defendant's claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, defendants effectively would have a veto power over any appointment, and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law.") As discussed throughout this Report, Petitioner was adequately represented at trial, and he has not alleged any act by defense counsel which supports a finding of deficient representation, much less constitutionally ineffective assistance. Any challenge to the denial of his first Marsden motion on appeal would have been futile.

With respect to the Faretta motion, Petitioner objects to the finding by the trial judge that his request to represent himself was equivocal. In order to be valid, a Faretta request must be knowing and intelligent, unequivocal, timely, and not for purposes of delay. Faretta, 422 U.S. at 835. The right to self-representation must be "asserted without equivocation" because it "cuts off the exercise of the right to counsel, often to individual detriment." United States v. Mendez-Sanchez, 563 F.3d 935, 945 (9th Cir. 2009).

There are three factors to consider in determining whether a request was equivocal: "[1] the timing of the request, [2] the manner in which the request was made, and [3] whether the defendant repeatedly made the request." Stenson v. Lambert, 504 F.3d 873, 882 (9th Cir. 2007). All three factors weigh against finding Petitioner's request to be unequivocal. Petitioner made his request two days before the scheduled start of trial, and stated that the only way he was willing to represent himself was if the trial was delayed. In addition to being conditioned on a

delay, the <u>Faretta</u> motion was clearly based on, and conditional to, the denial of the request for new counsel, and once that motion was denied, Petitioner abandoned his request to represent himself.  The Court finds that Petitioner has not shown prejudice sufficient to excuse the default caused by the failure to present this claim on appeal because he has not identified a basis for a challenge to the denial of his pre-trial <u>Marsden/Faretta</u> motion.  He therefore cannot establish "actual harm" arising from this Court's failure to address the merits of the claim sufficient to excuse the default.  <u>Vickers</u>, 144 F.3d at 617.

The second <u>Marsden</u> motion was made after trial, just before sentencing:

TJ:    How can I help you, sir?

Pet.:  I want to start off by, for instance, this guy right here.

TJ:    Your counsel.

Pet:   Counsel.  You said he's a good lawyer.  I think not.  Just from the fact that like with my discovery, I didn't get the rest of my discovery until after my trial, you know.  And I never got my preliminary hearing transcripts before my trial, which I should have been had [sic] that I never received at all.  I've been asking him multiple times to send them to me.  I should have had them in advance before trial to know what my defense was so I could come with my defense.  [¶]  Also, like with my witnesses, I had some good witnesses that he did not subpoena for my trial, which is another move I don't know why he didn't do.  [¶]  Then there is also I would like to put a conflict of interest here because I wrote the State Bar Association against Mr. John O'Connell.  So I put a conflict of interest between us two, and I would like him off of my case.

TJ:    Counsel, he says he didn't get to read the prelim transcript and other material.

DC:    Your Honor, he may not have gotten the preliminary hearing transcript.  I have to double-check it.  I think he asked for that, actually, after the trial.  I'll have to check to see if that was actually sent to him.  I honestly can't tell you whether or not that was sent to him or not at this point.  [¶]  Some of the discovery I think I have my staff working on that and going through it and sending it out.  Again, I'm not sure when it all got sent out to him.  I think some of the discovery was sent.  I can't remember what happened to that.  I know I had to go ask for it to be sent more than one time.  I think that was stuff, involving some of the discovery we received near the end of the case – I mean, prior to trial.

TJ:    Well, sir, you never brought this to my attention prior to the trial, did you?

Pet:   But I stated my facts, though.

TJ:    The question is, did you bring it to my attention prior to the trial?  The answer to that is no.

/ / /

| | | |
|---|---|---|
| 1 | Pet: | I put in a <u>Marsden</u> hearing to let you know he wasn't doing his job, but you were by his side saying he was doing his job.  And you never let me finished [sic], really.  You cut me off and overruled me.  So I left it alone at that.  You overruled it.  There wasn't nothing else I could say if you overruled me.  You already made up your mind. |
| 4 | TJ: | Well, the issue here is did he fulfill his professional responsibility; and the answer is, yes, he did. |
| | Pet: | That's what he didn't do. |
| | TJ: | What witnesses do you think you had that he didn't call? |
| | Pet: | I gave them the name.  They went to go talk to him.  I gave him the witnesses. |
| | TJ: | What would they have said? |
| | Pet: | That would have said the night of the crime, I was at their house.  That's what they would have said. |
| 11 | TJ: | That's an alibi. |
| 12 | DC: | Your Honor, we did investigate alibi witnesses.  Unfortunately, they can't account for a two- or three-hour period of time about when the crime took place.  They can put him there early in the evening, and they can say he was there late at night.  But there is a time period they can't account for that is in between.  That's the reason I didn't call them.  In some ways that almost makes it worse.  They can put him in before, but there is a big gap missing at almost the exact time when the crime is happening. |
| 16 | TJ: | Don't you see that? |
| 17 | Pet: | No, I don't see that.  Last time he told me it was a 30-minute difference.  30 minutes was no big difference to me.  Now it is two hours.  I don't know.  He's switching the words up.  He tells you something else. |
| 19 | TJ: | You know, from the trial perspective, you don't want to put on an alibi if it is not a real alibi.  Based on what he's telling me, it is not.  This is the fact of life.  The DNA on the do-rag and the hat, primarily the do-rag – you don't pass around a do-rag, right? |
| 21 | Pet: | Yes, you do.  It wasn't just my DNA on the do-rag, actually.  Predominantly doesn't mean it was just my DNA on it. |
| 23 | TJ: | That was a tough thing for him to overcome, tough thing to defend.  Now, he made a very good closing argument. |
| | Pet: | I don't think so. |
| 25 | TJ: | I thought it was an excellent one.  The problem is the jurors look at the facts.  They don't just look at the rhetoric of the lawyers during their argument.  To show you what a good job he did, notice how the jury, I think based on his advocacy and the facts and him pointing out to them the weaknesses, the counts you were acquitted of. |

1   Pet:   I didn't commit that crime, didn't commit none of them. So it doesn't matter. It didn't help nothing.

2

3   TJ:    I'm just telling you that the jury did a very good job of going through the evidence. Your lawyer did a very good job in presenting your defense. And as in everything in life, the chips fall where the chips fall. They made a call. Unfortunately for you, you didn't like it. [¶] That doesn't mean he didn't fulfill his professional responsibilities. He more than professionally represented you. And so I'm not trying to -- I just don't see your problem. The fact you wrote a letter to the state bar about him is immaterial.

4

5

6   Pet:   That's the conflict of interest. You don't know if it is a grudge or something. If you say he did his job – he had a whole year. Why didn't I get my full discovery? Why not my prelim transcripts? All my other crimes been had they [sic] preliminary transcripts. They got my trial transcript. I can't get nothing from this guy. I can't get my prelim transcript. I asked before the trial. I been asking for that. I asked for that a couple of weeks after my preliminary hearing, and I still have not got my prelim transcript to this day. It was the 21st of May. I haven't got my prelim transcript. I barely got the rest of my discovery after my trial. I should have had that before my trial. What if I saw something that could help me in my defense? He was doing his own thing. He left me in the shadows, like. This is my life. This is not John O'Connell's life. I bet if he was fighting for himself, he would have got himself off. This is my case right here.

7

8

9

10

11

12

13  TJ:    How would you overcome the DNA?

14  Pet:   What you mean? That's not the point right now. I would have did what I did if I was representing myself, but you overruled me. DNA don't mean nothing.

15

16  TJ:    Let's say you're the lawyer. You have the do-rag, and you have the hat. I disagree with you on that. DNA, believe me, any jury would rather use DNA evidence than 100 eyewitnesses. If you had 100 guys there, including your mother, that said you were the guy, the shooter, versus the DNA afterward, a jury would rather rely on the DNA than they would on 100 witnesses.

17

18

19  Pet:   It would be different if the DNA was at the crime scene. You talk about DNA, but you have people always getting acquitted from DNA because it was left somewhere; but it was not them.

20

21  TJ:    You might have an argument there if there had been no police pursuit. The police pursuit pretty much takes care of that.

22  Pet:   That don't really mean nothing, though. It is an alley. Between us, teenagers, we're also gang members or whatever, people trade items all the time. Y'all may not have did it when y'all grew up. But a hat and a do-rag, that get changed very easily. He was taking about braids, tie your braids. You don't tie no braids with a do-rag. You don't tie them in the back with a do-rag. [¶] A do-rag is for to keep your hair down or your braids fresh or for waves. You don't tie no braids in the back. That's not why the knot is there. That's all type of stuff that would make sense that I could have did differently because I know. But I'm at a disadvantage based on his so-called job of defending me. I was left in the blind. I also got –

23

24

25

26

27  TJ:    You certainly didn't express any of that during the trial.

28

-66-

| | | |
|---|---|---|
| 1 | Pet: | How am I supposed to do it? What else am I supposed to do? I figured once you |
| 2 | | in trial, you in trial. I tried to do a <u>Marsden</u> hearing. I was overruled. <u>Lopez</u> motion, I was overruled on both of them. What can I do in the middle of the trial? I don't know law like that. I don't know what I'm supposed to do. |
| 3 | | |
| 4 | TJ: | Exactly. That's why you don't want to represent yourself. |
| 5 | Pet: | It is not hard in trial to represent yourself. Anybody can speak. Anybody can. All you have to do is defend yourself; prove that you were not there, and you didn't do the crime. You don't have to know all certain type of this and this and |
| 6 | | all of that. Speak the facts. That all that matters, what you see and what you don't see. I want to bring in my witness who I want to bring in. I want to do what I |
| 7 | | want to do, not what somebody else wants to do for me. |
| 8 | TJ: | In any event, at this point, obviously, you don't like your lawyer. But that's not legal cause. The fact is that he more than competently represented you. In fact, |
| 9 | | I was impressed with how he handled what I would deem to be almost an indefensible case. No. No. Listen. On the counts, the carjacking counts, he |
| 10 | | pointed out exactly what needed to be pointed out to the jurors, which did raise in their mind a reasonable doubt. As I indicated before, I think between the video |
| 11 | | and the DNA, they put you at the scene. And I'm just telling you. [¶] At this point the <u>Marsden</u> will be denied. |
| 12 | | |
| 13 | Pet: | I have something else. Also I feel I have grounds for a retrial. Can I state why? |
| | TJ: | Sure. |
| 14 | Pet: | Juror Number 9 as the whole court witnessed, fell asleep multiple times during my |
| 15 | | trial. He fell asleep during the DNA lady, the expert lady testimony, which is critical in my defense. That's grounds for a retrial. |
| 16 | | |
| 17 | TJ: | I'm not going to do that without the prosecutor in here. Anything else on the <u>Marsden</u>? |
| 18 | Pet: | I want to put that conflict of interest in there. |
| 19 | TJ: | I know you think there is a conflict of interest. If every person who wanted to get rid of their lawyer, if all they had to do was simply write a letter to the state bar, |
| 20 | | then you could go though 100 lawyers in 100 days, right? |
| 21 | Pet: | No, that ain't true. |
| 22 | TJ: | Well, I think so. |
| 23 | Pet: | No. Not everybody can find a good lawyer. It is not many to pick from in this so-called system. This is not a fair system you all got here. That's what it is. It is |
| 24 | | only a very few good lawyers that is willing to actually try. All you got is coworkers. Y'all work together. Y'all is all friends. You talk and giggle and |
| 25 | | laugh. [¶] During the middle of trial when people facing their life – in the courtroom people facing the rest of their life in prison, you all want to giggle and |
| 26 | | laugh and make comments. You supposed to be serious. This is a courtroom. But you guys laugh, giggle, comment. Come on, somebody over here is in a bad seat |
| 27 | | right here, and y'all are like it is all good. It is not. Y'all supposed to be professionals. Why y'all giggling and making comments and laughing? This is |
| 28 | | supposed to be a professional setting. |

1   TJ:      Thank you, sir.  At this point we'll bring back in the D.A.

2   (RT 2272-80.)

3          The trial judge, once again, conducted a patient and thorough inquiry into Petitioner's

4   reason for wanting new counsel, and Petitioner merely indicated he had not received discovery

5   or a copy of the preliminary hearing transcript before trial.  He made no effort to indicate how

6   not having a transcript of the preliminary hearing, which he attended, affected counsel's

7   representation of him, other than a theoretical possibility that Petitioner may have been able to

8   contribute something to the defense if he had a copy of the transcript, or if he had seen the

9   discovery earlier.  In order to demonstrate a conflict of interest which rises to the level of a

10  federal constitutional violation, Petitioner must show that his trial counsel actively represented

11  conflicting interests and the conflict adversely affected counsel's performance.  Cuyler v.

12  Sullivan, 446 U.S. 335, 350 (1980).  The trial judge's finding that Petitioner failed to show an

13  actual conflict with counsel by simply writing a letter to the state bar association complaining

14  about his trial counsel was correct, because Petitioner failed to demonstrate any adverse effect

15  on his representation by the alleged conflict.  See Bonin v. Calderon, 59 F.3d 815, 827 (9th Cir.

16  1995) ("In the absence of an 'actual' conflict which squarely places the interests of the client in

17  opposition to those of the attorney, and is likely to compromise a reasonable attorney's ability

18  to comply with his legal and ethical obligations to represent his client with undivided loyalty,

19  the Cuyler standard cannot be met."); Williams v. Calderon, 52 F.3d 1465, 1473 (9th Cir. 1995)

20  (theoretical conflicts such as are created in underfunded appointment cases where counsel has

21  to choose between the client's best interest and paying for investigative services, are insufficient

22  to demonstrate an actual conflict under Cuyler).

23         Petitioner has identified no basis for a successful challenge to the denial of his post-trial

24  Marsden motion.  Schell, 218 F.3d at 1025-26; Rushen, 686 F.2d at 829.  He therefore cannot

25  establish "actual harm" from this Court's failure to reach the merits of the claim sufficient to

26  excuse the default arising from the failure to present the claim on direct appeal.  Vickers, 144

27  F.3d at 617.

28  / / /

### 3. Fundamental miscarriage of justice

Petitioner can still avoid the procedural default if he can demonstrate that a fundamental miscarriage of justice would result from this Court's failure to reach the merits of the claim. The United States Supreme Court has limited the "miscarriage of justice" exception to petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Schlup v. Delo, 513 U.S. 298, 327 (1995). "In order to pass through Schlup's gateway, and have an otherwise barred constitutional claim heard on the merits, a petitioner must show that, in light of all the evidence, including evidence not introduced at trial, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" Majoy v. Roe, 296 F.3d 770, 775-76 (9th Cir. 2002), quoting Schlup, 513 U.S. at 327. In applying this standard, "A petitioner need not show that he is 'actually innocent' of the crime he was convicted of committing; instead, he must show that "'a court cannot have confidence in the outcome of the trial.'" Majoy, 296 F.3d at 776, quoting Carriger v. Stewart, 132 F.3d 463, 478 (9th Cir. 1987) (en banc), quoting Schlup, 513 U.S. at 316.

Petitioner claims the alibi witnesses could demonstrate he is factually innocent because he was somewhere else at the time of the shooting, and he would have called those witnesses to testify if he had represented himself. As discussed above, that claim is without merit. Petitioner has not, either here or in the state courts, identified those witnesses or presented affidavits or declarations from them to rebut the state court findings that they were unable to account for his whereabouts during the shooting. He has failed to challenge the finding by the state trial and appellate courts, which are entitled to deference, that it was sound trial strategy for defense counsel not to call the alibi witnesses because they could account for Petitioner's whereabouts only before and after but not during the shooting. Petitioner has not shown that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt had his alibi witnesses testified at trial, or that this Court cannot have confidence in the outcome of the trial due to defense counsel's failure to call them to testify. Majoy, 296 F.3d at 776; Schlup, 513 U.S. at 314-15.

/ / /

### 4. Conclusion

The Court finds that Claim 7 is procedurally defaulted due to the failure to present it on direct appeal, and that Petitioner is unable to establish cause, prejudice, or the existence of a fundamental miscarriage of justice necessary to excuse the default. Alternately, to the extent Petitioner could overcome the procedural default, the Court finds, for the reasons discussed above in the prejudice section, that it fails to provide a basis for habeas relief. Accordingly, the Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 7.

### I.     Claim 8

Petitioner alleges in Claim 8 that the imposition of a sentence of 115 years-to-life in prison violated his right to be free from cruel and unusual punishment as protected by the Eighth Amendment under <u>Miller v. Alabama</u>, 567 U.S. ___, 132 S.Ct. 2455 (2012) (holding that mandatory life imprisonment without parole for persons under 18 years of age at the time of their crimes violates the Eighth Amendment). (Pet. at 7, 96.) He also alleges that he was denied his right to the effective assistance of counsel as protected by the Sixth Amendment by the failure of trial and appellate counsel to adequately challenge his sentence or challenge the denial of his <u>Faretta</u> and <u>Marsden</u> motions. (<u>Id.</u>)

Respondent answers that the state court's denial of the Eighth Amendment claim, on the basis that Petitioner was 19 years of age at the time he committed the offenses, is neither contrary to nor involves an unreasonable application of clearly established federal law. (Ans. Mem. at 69-71.) Petitioner replies that although he was 19 years and 23 days old at the time of the crimes, the cases which recognize that juveniles cannot be sentenced to life imprisonment, including <u>Miller</u> and <u>People v. Cabellero</u>, 55 Cal.4th 262 (2012) (holding that sentencing a juvenile offender to 110 years for a non-homicide offense is cruel and unusual punishment because it is beyond petitioner's life expectancy), even if not strictly applicable to his case, outline factors which must be considered by a sentencing judge, including age, mental state, mental capacity, and the possibility of rehabilitation. (Traverse at 18-19.) He alleges that the sentencing judge and the appellate court erred in failing to consider those factors in sentencing, / / /

1   and that his trial and appellate counsel provided ineffective assistance by failing to bring them

2   to the attention of those courts.  (Id.)

3       The Eighth Amendment aspect of Claim 8 was presented to the state superior and

4   supreme courts in habeas petitions. (Lodgment Nos. 9, 11.)  The superior court denied the claim

5   in a reasoned opinion and the supreme court summarily denied the petition without citation or

6   statement of reasoning.  (Lodgment Nos. 10, 12.)  The Court will look through the silent denial

7   by the state supreme court to the last reasoned opinion addressing the claim, the superior court

8   opinion, which stated:

9         The Eighth Amendment of the United States Constitution prohibits the

10   infliction of cruel and unusual punishment.  Without stating why, petitioner contends his sentence is so excessive, it constitutes cruel and unusual punishment, citing *Miller v. Alabama* (2012) 132 S.Ct. 2455.  The trial court sentenced

11   petitioner to 25 years to life, without the possibility of parole, for first degree murder; 25 years to life, with the possibility of parole, for one count of attempted

12   murder, 20 years to life, with the possibility of parole, for each of two counts of attempted murder; and stayed sentences for conspiracy to commit murder and

13   shooting at an occupied vehicle.

14         The right to freedom from excessive sanctions "flows from the basic

15   'precept of justice that punishment for crime should be graduated and proportioned" to both the offender and the offense." (*Miller v. Alabama* (2010) 132 S.Ct. 2455, 2463, citation omitted.)  "(T)he Eighth Amendment bars capital

16   punishment for children . . . (and) prohibits a sentence of life without the possibility of parole for a child who committed a nonhomicide offense." (*Ibid*.)

17

18         Petitioner provides no evidence of his birth date.  Therefore, he fails to prove he was a juvenile at the time the crimes occurred.  According to the Abstract

19   of Judgement in the case file, petitioner's birth date is September 27, 1989. According to the Amended Information, the crimes occurred on October 20, 2008.

20   Therefore, it appear that petitioner committed the crimes of which he was convicted when he was 19 years old, i. e., an adult.  Therefore, *Miller* neither shows petitioner's sentence constitutes cruel and unusual punishment, nor

21   mandates a lesser sentence than petitioner received.

22   (Lodgment No. 10, In re Grady, No. HC 21339, Order at 5-6.)

23       The United States Supreme Court has held that mandatory imposition of life without the

24   possibility of parole for a juvenile who did not commit a homicide constitutes cruel and unusual

25   punishment, because such a categorical ban is "based on the 'subjective judgment by a judge or

26   jury that the offender is irredeemably depraved,' which fails to take into account all of the

27   psychological limitations and vulnerabilities of juveniles.'" Moore v. Biter, 725 F.3d 1184, 1193

28   (9th Cir. 2013), quoting Graham v. Florida, 560 U.S. ___, 130 S.Ct. 2011, 2027-31 (2010). The

Court thereafter applied the same categorical ban barring mandatory life imprisonment without the possibility of parole for juvenile offenders who have been convicted of homicide. Miller, 132 S.Ct. at 2465-66 ("[T]he characteristics of youth, and the way they weaken rationales for punishment, can render a life-without-parole sentence disproportionate.")

Petitioner cannot rely on Miller or Graham to demonstrate that the appellate court's denial of his claim involved an unreasonable application of clearly established federal law, because he was not a juvenile at the time he committed homicide, and the Supreme Court has not yet extended the rationale of Miller and Graham to non-juvenile offenders. See Woodall, 134 S.Ct. at 1706 (holding that "if a habeas court must extend a rationale before it can apply to the facts at hand," then by definition the rationale was not 'clearly established at the time of the state-court decision.'"), quoting Yarborough, 541 U.S. at 666. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." Woodall, 134 S.Ct. at 1706-07, quoting Richter, 131 S.Ct. at 787.

In order for Petitioner to be entitled to relief, he must demonstrate that it was objectively unreasonable for the appellate court to determine that this is not one of the rare cases which leads to an inference of gross disproportionality. Lockyer, 538 U.S. at 75-76; Harmelin v. Michigan, 501 U.S. 957, 1005 (1991) (holding that a comparison between the gravity of the offense and the severity of the sentence must be made first in order to determine whether it is one of the "rare" cases which leads to an inference of gross disproportionality.); United States v. Bland, 961 F.2d 123, 128-29 (9th Cir. 1992) (same). The Supreme Court upheld a life sentence for distribution of cocaine in Harmelin, and has upheld life sentences for recidivists with such nonviolent felonies as the theft of golf clubs, Ewing v. California, 538 U.S. 11, 28 (2003), and obtaining money by false pretenses, Rummel v. Estelle, 445 U.S. 263, 284 (1980).

Petitioner's crimes are much worse than those in Harmelin, Ewing and Rummel, and his sentence comparable with sentences imposed in those cases, all of which were found not to be disproportional. Since there is no clearly established federal law holding that a sentence of 115 years-to-life for a 19 year-old who murdered one person and attempted to murder three others

violates the Eighth Amendment, and because it is objectively reasonable to find that such a sentence is not grossly disproportionate to those crimes, the state court's adjudication of this claim is neither contrary to, nor involves an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  Lockyer, 538 U.S. at 75-76; Williams, 529 U.S. at 412; Harmelin, 501 U.S. at 1005.

With respect to Petitioner's allegation that he received ineffective assistance of trial counsel during the sentencing, the state superior court stated:

> Petitioner also claims ineffective assistance of counsel relating to his sentence, citing *Detrich v. Ryan* (9th Cir. 2012) 677 F.3d 958.  In that case, the court found that trial counsel had rendered IAC for failure to reasonably investigate and present evidence of mitigating circumstances during the penalty phase.  (*Id.*, at pp. 974-975.)  Petitioner presents no evidence or argument whatsoever about any alleged failure by his trial counsel to investigate mitigating circumstances or any other alleged deficiency. . . .

> A habeas petition must support its claims with "the necessary allegations of fact"  (*In re Sandel* (1966) 64 Cal.2d 412, 413, citing *In re Swain* (1949) 34 Cal.2d 300, 304.)  "Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing."  (*In re Marquez* (2007) 153 Cal.App.4th 1, 11, citing *People v. Duvall* (1955) 9 Cal.4th 464, 474.)

> Without this evidence and a more detailed explanation of the basis for his allegations, petitioner has failed to establish that either trial or appellate counsel's representation was unreasonable or prejudicial.  Therefore, he has failed to establish IAC.

(Lodgment No. 10, In re Grady, No. HC 21339, Order at 5.)

Although Petitioner did not support this claim with allegations in the state court, he alleges in this Court that he has been "sentenced to a long, slow death without the death penalty execution, and deemed to be unrehabilatatible at the youthful age of (19) nineteen, without trial, sentencing or appellate counsel(s) raising and challenging the sentence on the grounds that Petitioner will be rehabilitated, that he can one day become a productive member of society, and that due to his age and mental/psychological capacity at the time of the crime(s) he should be sentenced with the opportunity to one day be paroled." (Traverse at 19.)  This aspect of Claim 8 appears to be procedurally defaulted for the same reasons discussed above regarding the other aspects of ineffective assistance of counsel presented by Petitioner to the state courts without

supporting allegations.  See Pombrio, 631 F.Supp.2d at 1251-52 (explaining that a citation to Duvall points to correctable defects and therefore render such claims unexhausted in federal court).  The claim is technically exhausted and procedurally defaulted for the same reasons discussed above.  Because, for the following reasons, this claim fails on the merits under a de novo standard of review, the Court recommends denying relief without reaching the issue of procedural default.  Lambrix, 520 U.S. at 525; Franklin, 290 F.3d at 1232.

Petitioner's trial counsel argued at sentencing:

> So I would argue that the sentences should run concurrent.  [¶]  If that's the case, I think that would be count 1 with the 25 years.  And, of course, I understand that the gun allegation has to run consecutive to that, which would make it a 50 to life, which is a substantial period of time.  In fact, in reality, it is basically a life sentence for my client anyway and I think serves every purpose that the people have laid out in their motion with punishment and safety to the community.  He's – I forget his age.  He's 22.  Actually, 20 years old.  After 50 years and he serves that 100 percent, I think the soonest he would get out, if he has credit for time, would be around – even if he was eligible for parole – would be 68 years old.  And the likelihood of actually being paroled is not very high.  [¶]  Your Honor, I also ask that you consider not imposing the gun allegation under the Eighth Amendment of the U.S. Constitution as it is cruel and unusual punishment.  In that case it would be 25 to life.  Most people who are 25 to life are not getting paroled.  And at that point he would be in his 40's and well past his period of doing anything.  If he gets paroled, he would have done something to deserve it.

(RT 2289-90.)

Thus, Petitioner is incorrect that his trial counsel did not bring to the attention of the trial judge factors regarding age and ability to be rehabilitated.  The trial judge indicated that Petitioner's crimes were very serious, that they were the type of crimes that people in the community want those who perpetrate to be put away for a long time, that it was lucky that more people in the Probe were not hit, and lucky that people shopping at the liquor store, including a man urinating on a truck at the time, were not hit.  (RT 2293-95.)  Petitioner has identified no basis for his allegation that trial counsel did not present adequate argument at the sentencing hearing or that appellate counsel should have challenged the sentence on appeal. There is no basis to support Petitioner's contention that he received ineffective assistance of trial or appellate counsel in connection to sentencing, and the Court recommends denial of this aspect of Claim 8 notwithstanding any resultant procedural default.

/ / /

The final aspect of Claim 8 alleges that trial and appellate counsel were deficient in failing to challenge the denial of the Marsden and Faretta motions. This claim was presented to the state supreme court in a habeas petition, which was summarily denied without a statement of reasoning, but the claim was not presented to any lower state court. (Lodgment Nos. 9-12.) The Court must presume that the silent denial by the state supreme court was an adjudication on the merits of the federal constitutional claim presented. See Richter, 131 S.Ct. at 784-86 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.") This Court "must determine what arguments or theories . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court. Id. at 786.

As discussed above in the prejudice section of the procedural default analysis of Petitioner's claim (Claim 7) that the trial court improperly denied his Marsden and Faretta motions, Petitioner has identified no basis to adequately challenge the denial of those motions. Federal habeas relief is unavailable because the state supreme court may have reasonably determined that because there was no basis to challenge the denial of those motions, the failure of trial and appellate counsel to do so did not constitute deficient performance or prejudice. See Richter, 131 S.Ct. at 791 ("Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial."), quoting Strickland, 466 U.S. at 686. The Court finds that it is not possible that "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in" Strickland. Richter, 131 S.Ct. at 786.

Because the denial of Claim 8 by the state court is neither contrary to, nor involved an unreasonable application of clearly established federal law, and was not based on an unreasonable determination of the facts, and because the aspect of Claim 8 alleging ineffective assistance of counsel in sentencing is without merit, the Court **RECOMMENDS** habeas relief be **DENIED** as to Claim 8.

13cv2479

**J.      Cumulative Error**

Petitioner alleges in the Traverse that, even assuming the trial errors were harmless, their cumulative effect resulted in a violation of his federal due process rights.  This claim has not been presented to any state court.  For the reasons discussed above, the cumulative error claim is technically exhausted and procedurally defaulted.  Because this claim fails on the merits under a de novo review, the Court recommends denying it without addressing any procedural default.  Lambrix, 520 U.S. at 525; Franklin, 290 F.3d at 1232.

"The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007), citing Chambers v. Mississippi, 410 U.S. 284, 290 n.3 (1973).  Even where no single trial error in isolation is sufficiently prejudicial to warrant habeas relief, "the cumulative effect of multiple errors may still prejudice a defendant."  United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  Where "there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant."  Id., quoting United States v. Wallace, 848 F.2d 1464, 1476 (9th Cir. 1988).  "Where the government's case is weak, a defendant is more likely to be prejudiced by the effect of cumulative errors."  Frederick, 78 F.3d at 1381.

Although the government's case here relied primarily on circumstantial evidence, as discussed above in Claim 1 and throughout this Report, it was by no means weak.  Furthermore, the only error Petitioner has identified is the potential instructional error regarding conspiracy to commit attempted murder.  As set forth above in Claim 2, this Court is required by Supreme Court precedent to determine whether that error was harmless without determining whether it was an error at all, or whether it constituted a federal constitutional error.  The court has also analyzed Claims 3-5 to determine whether, assuming errors occurred, they were harmless, but only after finding no error occurred.  Because Petitioner has identified only one potential error, there is no basis for a finding that trial errors accumulated to the point of a federal due process violation.  Even assuming Petitioner could demonstrate that the trial court erred in instructing

the jury on the conspiracy and kill zone theories of attempted murder, erred in allowing the introduction of Davis' testimony that she was afraid to testify, and erred in allowing the introduction of the forensic video analyst's expert testimony, in light of the strong evidence of guilt, such errors could not have accumulated to the point of a due process violation. The Court recommends denial of this claim notwithstanding the failure to present it to the state court, and without reaching the procedural default issue, because it is without merit. Lambrix, 520 U.S. at 525; Franklin, 290 F.3d at 1232; Frederick, 78 F.3d at 1381.

## VI.

## CONCLUSION AND RECOMMENDATION

For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered denying the Petition and dismissing this action with prejudice.

**IT IS ORDERED** that no later than **January 9, 2015**, any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **January 16, 2015.** The parties are advised that failure to file objections with the specified time may waive the right to raise those objections on appeal of the Court's order. See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156 (9th Cir. 1991).

DATED:  December 16, 2014

Hon. Mitchell D. Dembin
U.S. Magistrate Judge

CC:        ALL PARTIES

13cv2479